# Staunton

## FLOYD GALLIHER v. COMMONWEALTH.

September 21, 1933.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*L. P. Summers,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

Epes, J., delivered the opinion of the court.

Floyd Galliher, a young man twenty-one years of age, was tried before a justice of the peace upon a warrant charging that, on June 30, 1931, he did "by force unlawfully attempt to impede J. W. Lambert, * * * a peace officer of the town of Saltville, Virginia, in the discharge of his duty by unlawfully assaulting said J. W. Lambert."

The justice found him guilty and fined him ten dollars. From this judgment he appealed to the Circuit Court of Smyth county, in which he was tried before a jury. The jury returned a verdict finding him guilty and fixing his punishment at sixty days in jail and a fine of fifty dollars. The court entered judgment sentencing him accordingly; and to this judgment Galliher makes, in effect, two assignments of error: (1) The court erred in refusing to set aside the verdict on the ground that it is contrary to the law and the evidence, and without evidence to support it. (2) The court erred in admitting evidence as to what occurred at the mayor's office when Galliher was brought there about two hours after the offense with which he is charged is alleged to have been committed.

The Commonwealth, to sustain its charge, introduced five witnesses, Lambert, Miller, Stephenson, Snodgrass and Gouvas. Only one of them, J. W. Lambert, had any knowledge of what took place at the time the offense is alleged to have been committed. The testimony of the others is relevant only upon the question: Was Galliher drunk at the time Lambert arrested him?

The testimony certified up to us has been reduced to narrative form, in doing which it is difficult to reflect the full force and shades of meaning of the testimony of the several witnesses. This fact and the fact that the trial judge saw and heard the witnesses testify are to be borne in mind in reviewing the action of the trial court in refusing to set aside the verdict in a case such as this is.

At the time the offense charged is alleged to have been committed Lambert was in the act of arresting Galliher

without a warrant, on the charge that he was drunk. Lambert's account of what took place is this:

On the Sunday night in question he saw Galliher at Price's restaurant, and spoke to him. He "saw him walk and he staggered some and talked some;" and he (Lambert) "suspecting that he was intoxicated was watching his conduct." "After some time" Galliher started up the street with Ernest Waddell going towards Galliher's home. "Shortly thereafter" he (Lambert) got in his automobile and followed the boys. He drove around in front of them, got out and walked back towards the boys, and met them near the public school building (which is about one-fourth of a mile from Price's restaurant). They had been joined by a third boy (Cornelius Wheeler) and were walking along the sidewalk, three abreast, Galliher being next to the curb. They were "doing nothing but talking when I drove around them and stopped them." Then, to use the language of the narrative contained in the record, Lambert "said: 'Galliher, you are drunk,' and Galliher replied: 'Hell, no,' and witness said: 'I'll have to,' when Galliher hit, struck witness on his left shoulder with his right *hand* (italics ours) before witness could complete the sentence he started, which was: 'I'll have to arrest you;' and witness struck the prisoner across his forehead with his billy and knocked him partly down, and he was getting up again, and then scuffled with and fought him until he got him on the ground, when he handcuffed him and took him to the jail." He "did not smell liquor on the breath of the defendant," nor did he "see the prisoner have liquor or take a drink that night;" but he "knows he was drinking from his conduct."

Being told by the Commonwealth's attorney to tell "what you did after you took the prisoner to the mayor's office," Lambert responded:

"I took the prisoner to the hospital to have his head treated and dressed. It was bleeding some and he was complaining. I walked him down the street about one-fourth of a mile, and after his head was dressed I took him

and put him in the jail. After a while * * * his brothers came and wanted to bail him out. I telephoned Mr. Miller, the chief, and he came down and agreed to accept a cash bond. I took the prisoner out of the calaboose, and when he walked out into the mayor's office, he took the bloody bandage off his head, threw it on the floor, and was cussing about the matter. He was acting like a drunk man, and Mr. Miller ordered me to put him back in the calaboose and let him stay there until he got sober and knew how to talk. I did as directed."

When questioned with reference to the suggestion that he bore a grudge against Galliher because of his suspicion that Galliher had thrown water on him a few nights before, Lambert said: "I was not mad at the prisoner for throwing water on me. I don't know that he did throw the water, but I suspected him."

John E. Miller, the chief of police of the town, did not see Galliher that night until "shortly before midnight," when about two hours after he had been arrested, he was brought to the mayor's office. His testimony as narrated is this:

"When Mr. Lambert brought the prisoner out of the calaboose and into the mayor's office, the prisoner jerked the bandage, which was bloody, off his head, and threw it to the floor, and cursed all of them for locking him up and for arresting him; and witness being of opinion that the prisoner was drunk ordered him locked up until he had sobered up. I thought the prisoner was drunk, but I did not smell any liquor on him, or see any liquor about him."

Claude Stephenson was at the mayor's office when Galliher was brought there. He testified that he "saw the prisoner grab the bandages off his head and curse and act like he was drunk;" and that he "thought he was drunk," but "saw no liquor and smelled no liquor, and was not close enough to the prisoner to have done so."

After Galliher and Waddell left Price's restaurant, where they had gotten something to eat, they stopped in

a restaurant run by Charlie Gouvas, a Greek. He testified that he "saw the prisoner and thought he was drunk and that he thought the other boys were trying to get him out and away before the officers saw him;" that he "saw no liquor and smelled no liquor;" but that "defendant's actions and conversation made me think he was drunk."

W. F. Snodgrass, a watchman for the Matheison Alkali Works, testified that "about nine o'clock * * * he came along the street and saw the prisoner and another boy standing in a doorway;" that "the prisoner was standing there with his head down, and appeared to the witness to be drunk;" that he said to him "he had better be getting on home," but Galliher made no reply; that he was close enough to Galliher for him to have heard this remark but does not know whether he heard it or not; that he "saw no liquor or liquor drinking, nor did the prisoner move out of his tracks or say anything," but that he made the remark above mentioned "because he thought the prisoner was drunk or drinking."

The testimony of the accused and the two boys who were with him at the time Lambert proceeded to arrest him, one of whom had been with him for some hours, is that he was not drunk and had not been drinking; that he did not strike or attempt to strike Lambert at any time; that when Lambert accosted them and said: "Galliher, you are drunk," he replied: "Hell, no, I am not drunk," whereupon Lambert struck him over the head with his billy, knocked him down, beat him for a while, and then handcuffed him and took him to jail; and all that Galliher did was to throw up his hand to try to ward off the blow at the time Lambert struck him the first blow. The statements of Galliher and his other witnesses with reference to what took place at the mayor's office accord with those given by the witnesses for the Commonwealth. Galliher explains his conduct there, saying that he was not drunk, but "was mad to know that a man could be beaten up and treated this way anywhere when he was not guilty of any offense."

The nurse who attended him when he was taken to the hospital was put on the witness stand by him, and testified that "several stitches were taken on his forehead;" that she dressed and bandaged his head, and that "if he was drunk or drinking she could not tell it."

H. K. Price, who waited upon Galliher at his restaurant, and Bradley Price, who saw and talked with him there, both of whom were introduced by the accused, testified positively that he "was not drunk or drinking." The two brothers of Galliher, who saw and talked with him in jail and at the mayor's office, testify positively that he was not drunk and had not been drinking that night.

Claude Heath, the last witness introduced by the accused, testified that he was in the restaurant when Floyd Galliher came in and during the whole time he was there; that he "talked to him and he was not drinking or drunk;" that "Lambert was out there (*i. e.* in front of the restaurant) and said he would give five dollars to know who threw water on him from the upstairs;" that nobody said anything about it to him (Lambert); and that "Lambert thought Floyd and myself threw the water on him, but we did not."

Accepting Lambert's version of what occurred as true, the evidence discloses no sufficient excuse for the severe blow on the head and the subsequent beating which he gave Galliher in effecting his arrest; but Lambert is not here on trial for using unnecessary force and doing Galliher unnecessary bodily harm in effecting his arrest. When an officer attempts to arrest, without a warrant, a person who is committing a misdemeanor in his presence, if, as the Commonwealth contends was the case here, the accused strikes the officer before the officer strikes him or uses any unnecessary force against him, he is guilty of resisting arrest; and the fact that the officer subsequently uses more force than is necessary and does the accused unnecessary bodily harm in effecting his arrest does not exculpate the accused from the offense of resisting the officer. This is true even though the officer

may have subsequently used so much more force than was necessary that he committed a crime in so doing which is deserving of a much severer punishment than that committed by the accused in resisting the arrest.

In this connection, however, the following observation made by this court in *Bourne* v. *Richardson,* 133 Va. 441,. 113 S. E. 893, 900, and reiterated in *Crosswhite* v. *Barnes,* 139 Va. 471, 124 S. E. 242, 40 A. L. R. 54, is pertinent: "Officers of the law must be accorded the fullest protection in the discharge of their duties, but the liberty (*and rights*) of the citizen is of equal importance, and nothing can so militate against the effective administration of justice and a proper regard for the law of the land as unlawful and reckless conduct on the part of officers who are charged with its enforcement." (Words in italics added by us.)

 With a few statutory exceptions, which need not be noticed here, the common law relating to arrest is the law on that subject in Virginia. At common law "a peace officer may arrest without a warrant for a breach of the peace committed in his presence, but for no other misdemeanor." Beale's Cr. Pl. & Pr., section 21, and Burks' note thereto; 84 Am. St. Rep. (note) pp. 685-686; 2 R. C. L. p. 447; *State* v. *Hunter,* 106 N. C. 796, 11 S. E. 366, 8 L. R. A. 529 *et seq; Muscoe* v. *Com.,* 86 Va. 443, 10 S. E. 534.

██ An offense is committed within the presence of an officer, within the meaning of this rule, when he has direct personal knowledge, through his sight, hearing, or other senses that it is then and there being committed. 2 R. C. L. p. 448; 84 Am. St. Rep. p. 686; *McBride* v. *United States* (C. C. A.) 284 Fed. 416, certiorari denied 261 U. S. 614, 43 S. Ct. 359, 67 L. Ed. 827; *Elrod* v. *Moss* (C. C. A.) 278 Fed. 123; *Garske* v. *United States* (C. C. A.) 1 Fed. (2d) 620; *Peru* v. *United States* (C. C. A.) 4 Fed. (2d) 881; *Campbell* v. *Com.,* 203 Ky. 151, 261 S. W. 1107; *State* v. *McDaniel* (on rehearing) 115 Or. 187, at p. 237, 231 Pac. 965, 237 Pac. 373; *State* v. *Koil,* 103 W. Va. 19, 136 S. E. 510.

██ "Mere drunkenness, with no other act beyond, is not indictable at the common law. There are old English

statutes, early enough to be common law with us, making drunkenness punishable or finable, yet they do not seem to have been recognized in this country." Bishop, Cr. L. (9th Ed.) section 399. But by section 18 of the Layman act, Acts 1924, p. 593, ch. 407, as amended by Acts 1926, p. 419, ch. 231, Michie's Code Va. 1930, section 4675(18), it is provided that "any person who, being intoxicated as defined in this act, shall appear in any public place" shall be fined not less than $5 nor more than $50, *i. e.*, shall be guilty of a misdemeanor. And section 81 of the same act, Michie's Code Va. 1930, section 4675(81), provides that "any person who has drunk enough ardent spirits to so affect his manner, disposition, speech, muscular movement, general appearance or behavior, as to be apparent to observation, shall be deemed, for the purposes of this act, to be intoxicated."

Where there are such statutes, drunkenness is generally held to constitute a breach of the peace within the meaning of the rules relating to arrest. 84 Am. St. Rep. (note), p. 693; *Muscoe* v. *Com.*, 86 Va. 443, 10 S. E. 534. See, also, *People* v. *Johnson*, 86 Mich. 175, 48 N. W. 870, 24 Am. St. Rep. 116, 13 L. R. A. (note), p. 163 *et seq.*, for what constitutes a breach of the peace.

 The real question presented by the first assignment of error is: Was there evidence to support a verdict predicated upon a finding (1) that Floyd Galliher was drunk, within the meaning of the Virginia statute, at the time Lambert proceeded to arrest him, and (2) that Galliher struck, or attempted to strike, Lambert before Lambert struck him over the head with his billy? We are not able to say that there was no evidence, which, if believed, was sufficient to support a verdict predicated upon these two findings. We are, therefore, of the opinion that the first assignment of error is not well made.

 The objection made by the accused to the introduction of the testimony as to what occurred at the mayor's office was that "it is immaterial as to what he did after the difficulty in question," and any evidence with refer-

ence thereto would "tend to confuse and mislead the jury on matter immaterial to the issue." As the evidence negatives any idea that Galliher had had anything intoxicating to drink between the time he was arrested and the time he was brought to the mayor's office, what occurred there was of some, though under the facts of this case perhaps weak, evidential value as to whether he was drunk at the time of his arrest. For this reason the court did not err in admitting evidence as to what occurred at that time.

The judgment of the court will be affirmed.

*Affirmed.*