**Richmond**

GIFTON ANTHONY TAYLOR, et al.

v.

COMMONWEALTH OF VIRGINIA

No. 1279-85

Decided May 17, 1988

COUNSEL

Ronald I. Kurland; Michael C. Allen (Kroop, Kurland & Rosenberg; Englisby, Barnes & Allen, on briefs), for appellants.

Russell C. Williams, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

Opinion

## ON HEARING EN BANC

**BARROW, J.**—In this criminal appeal we conclude that a drug courier profile, having no apparent relationship to criminal activity, may not alone justify stopping an automobile on a highway for further investigation. Consequently, the evidence seized in a subsequent search of the defendants' automobile was inadmissible and the defendants' convictions must be reversed.

A Chesterfield County police officer, patrolling Interstate Route 95, saw a northbound automobile having characteristics similar to those contained in a drug courier profile. The automobile was a four-door Toyota with Florida rental plates. Two black men, appearing to be between twenty and thirty-five years old, were in the car. The car was riding level and moving at the speed limit.

The police officer had attended a briefing given by the Virginia State Police. He was told to be alert for vehicles having these characteristics: (1) traveling north on Interstate 95, (2) bearing Florida license plates containing the letter "Z," indicating a rental vehicle, (3) containing black or Hispanic male occupants between the ages of twenty and thirty-five years, and (4) the occupants exhibiting nervous behavior.[1] Other suggested characteristics, such as (1) a rental agreement or vehicle registration under an alias, (2) little or no luggage, (3) luggage stowed in the rear passenger seat, were not observed by the police officer prior to his stopping the vehicle, and, therefore, are not relevant to our inquiry.

The officer kept the automobile under surveillance for four to five miles and noticed that its speed varied, although it remained within the speed limit. The officer, driving an unmarked automobile, pulled parallel with the driver's side of the Toyota, saw the driver of the Toyota "cut his eyes" toward the officer's automobile, and noticed the Toyota's speed decrease slightly. After traveling less than a mile alongside the driver's side of the Toyota at a speed slightly below the speed limit, the officer dropped back and

---

[1] The two-hour briefing was videotaped, but the trial court, sustaining defendants' objection at a suppression hearing, declined to view any portion of the tape. The record contains no evidence of how the drug courier profile was derived. Nor does it contain any evidence of its predictive validity.

positioned his vehicle on the passenger side. At that time he saw both occupants of the car "cut their heads back" and again "cut their eyes" in the officer's direction.

The police officer radioed other officers in another vehicle to stop the Toyota. Using red lights and siren the other police vehicle stopped the Toyota, and further investigation was conducted. The defendants, who were the occupants of the Toyota, consented to a search which uncovered approximately 173 pounds of marijuana in the trunk of the Toyota. The defendants were arrested and later convicted of conspiring to possess and possession of marijuana with intent to distribute. The only issue before us is whether the police officers were authorized to stop the defendants' vehicle.

Even when the purpose of a stop is limited and the resulting detention brief, the fourth and fourteenth amendments of the United States Constitution apply to stopping an automobile and detaining its occupants. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Lowe v. Commonwealth*, 230 Va. 346, 349, 337 S.E.2d 273, 275 (1985), *cert. denied*, 475 U.S. 1084 (1986). Since the driver of an automobile must stop when directed to do so by the siren and flashing lights of a police vehicle, there can be no suggestion that the fourth amendment does not apply because the driver did not have to comply. *See Florida v. Royer*, 460 U.S. 491, 497 (1983) (in some instances an individual approached by law enforcement officers on the street or in a public place may "go on his way").

Before a vehicle may be stopped on the highway, there must be "specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual" or the vehicle must be stopped "pursuant to a plan embodying explicit, neutral limitations on the conduct of the individual officers." *Brown v. Texas*, 443 U.S. 47, 51 (1979); *Lowe*, 230 Va. at 350, 337 S.E.2d at 276. In this case the Commonwealth does not assert and the evidence does not suggest that the defendants' vehicle was stopped pursuant to such a plan. Therefore, the stop of the defendants' vehicle must have been based on "specific, objective facts."

The prerequisites to an investigative stop of an automobile are comparable to those required for an "on-the-street encounter." *United States v. Brignoni-Ponce*, 422 U.S. 873, 880-81 (1975) (discussing *Terry v. Ohio*, 392 U.S. 1 (1968)). *Terry* re-

quires a police officer to be able to "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" stopping a person to conduct further investigation. *Terry*, 392 U.S. at 21. More specifically, an investigative stop of an automobile "must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981) (footnote omitted).

■ A police officer must assess all of the information available to him, and that assessment must produce "a suspicion that the particular individual being stopped is engaged in wrongdoing." *Cortez*, 449 U.S. at 418. In making this assessment and arriving at this suspicion, a trained law enforcement officer may identify criminal behavior which would appear innocent to an untrained observer; however, "any such special meaning must be articulated to the courts and its reasonableness . . . assessed independently of the police officers' subjective assertions." *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982).

■ This "particularized suspicion" is not achieved by the mere presence of drug courier profile characteristics. *See Reid v. Georgia*, 448 U.S. 438, 440-41 (1980); *United States v. Haye*, 825 F.2d 32, 34 (4th Cir. 1987); *United States v. Aguiar*, 825 F.2d 39, 40-41 (4th Cir. 1987). More is required to elevate a law enforcement officer's "inchoate and unparticularized suspicion or 'hunch' " to a "reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid*, 448 U.S. at 440-41.

The characteristics which the officer relied on in this case were insufficient to support a reasonable and articulable suspicion that the defendants in fact possessed illegal drugs. Black or Hispanic males from twenty to thirty-five years of age driving northbound on Interstate 95 in Florida registered rental cars constitute a large category of presumably innocent travelers. *See Reid*, 448 U.S. at 442. These characteristics have no apparent relationship to criminal activity, and there is no evidence in this record of an empirical relationship between these characteristics and criminal behavior. Thus, the drug courier profile provided no more than an "inchoate and unparticularized suspicion or 'hunch.' " *Id*. This "hunch" may be a useful tool for law enforcement officers in identifying those who should be closely watched but, without more, cannot be the

justification for an investigative detention. Becton, *The Drug Courier Profile: "All Seems Infected That Th' Infected Spy, As All Looks Yellow To The Jaundic'd Eye,"* 65 N.C.L. Rev. 417, 471 (1987).

The officer's observation that the occupants "cut their heads back" and "cut their eyes" in his direction adds nothing to the supposition that the defendants were engaged in criminal activity. Although in some contexts nervous behavior may be relevant, the mere observation that a traveler is nervous is not indicative of criminal behavior. *Gooding*, 695 F.2d at 84. The presence of an unidentified motor vehicle alternately tracking the defendants' vehicle from one side to the other for a period of four to five miles on an interstate highway could explain why the defendants, concerned for their own safety, looked in the officer's direction. Neither the drug courier profile nor the officer's other observations provided an objective manifestation that the defendants were, or were about to be, engaged in criminal activity. Therefore, the officers were not justified in stopping the automobile for further investigation, and doing so violated the protection assured the defendants by the fourth and fourteenth amendments of the United States Constitution. As a result, the subsequent search of the automobile was illegal, and the evidence seized was inadmissible. For these reasons, we reverse the defendants' convictions and dismiss the indictments against them.

*Reversed and dismissed.*

Koontz, C.J., Benton, J., Coleman, J., Keenan, J., and Moon, J., concurred.

Baker, J., concurring.

I concur in the finding that appellants' Fourth Amendment rights were violated when their car was stopped. I am troubled by the apparent acceptance by some courts—and seemingly the majority here—that there is a legally meaningful entity known as a drug courier profile.

I am of the opinion that reviewing courts have permitted themselves to become so engrossed with the phrase "drug courier profile" that they have attributed to it more significance than it is due. The phrase, created by drug enforcement officers, has been declared in some quarters to be a useful law enforcement tool. It

may be that; however, it is a legally meaningless term, for there is no such thing as *a* drug courier profile. As stated by Judge Moylan in *Grant v. Maryland*, 461 A.2d 524, 526 (Md. App. 1983): "[T]here is no such thing as a single drug courier profile. . . . It is simply an open-ended laundry list of more or less suspicious circumstances, some of which may occur in a particular case." Some members of the Supreme Court of the United States have referred to it as "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *Mendenhall v. United States*, 446 U.S. 544, 547 n.1 (1980).

In my judgment, it is time that all courts deemphasize the references to the profile and consider the cases on the basis of the real issue that is before them, to-wit: Evaluated by the neutral scrutiny of a judge, do the specific and articulated facts upon which, according to the record, the particular seizure was based, warrant the intrusion? *See United States v. Cortez*, 449 U.S. 411, 417 (1981). Thus, the issue to be decided is not whether the so called "drug courier profile" may alone justify the intrusion, but whether there is a particularized and objective basis for suspecting the particular person stopped of criminal activity.

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

\* \* \* \* \*

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Id.* at 417-18 (citations omitted).

While it is well established that trained police officers may observe and be able to perceive and articulate meaning to presumably innocent conduct which may pass without notice by an untrained observer, *see Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979), those observations and perceptions must be explained for the record so that the trial judge may evaluate the basis for the officer's conclusion that criminal activity may have been afoot, and determine independently of the officer's conclusion, whether the suspicion upon which he acted was reasonable. *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982). Thus, it is for the trial judge to decide, based upon the evidence presented, whether, in light of the circumstances, the articulated facts are of such import as to support a reasonable suspicion that the person stopped was illegally engaged in transporting drugs. *Id.*; *United States v. Berry*, 670 F.2d 583, 601 (5th Cir. 1982). A particular seizure may be constitutionally valid, not because the facts supporting the seizure have been designated as a drug courier profile, but because the articulated facts meet the foregoing requirements.

I agree that in a particular case an experienced officer, employing a profile, may be able to demonstrate that certain articulated facts will warrant a limited intrusion for the purpose of further investigation.

> A larger number of the more suspicious circumstances may well pass constitutional muster in a given case, whereas a smaller number of more ambiguous circumstances will not pass muster in another case. In *United States v. Mendenhall*, the particular characteristics there present were deemed to be enough to establish articulable suspicion for a *Terry*-type stop. In *Reid v. Georgia*, a different collection of characteristics from the laundry list did not pass constitutional muster. Yet, in the next case, *Florida v. Royer*, a different collection of characteristics did pass constitutional muster. There is no inconsistency among these three cases.

*Grant*, 461 A.2d at 526.

Stopping an automobile in transit is "materially more intrusive" than airport stops of deplaning passengers. *Mendenhall*, 446 U.S.

at 556-57. Appellants were stopped while in transit. The investigating officers do not allege that they observed any specific violation of law prior to stopping appellants' vehicle. The profile characteristics used to justify the seizure included conduct associated with innocent travel. It is not illegal to be young, black, travel in a rented car, travel on the north-south route known as Interstate 95, or "cut" one's eyes at a police officer who drives up beside you, first on your left side and then to your right. Nor does it inevitably follow that if one slows his vehicle under such circumstances such behavior should be classified as "suspicious."

For the reasons stated above I am of the opinion that the selections from the "laundry list" articulated as the reason for the stop were not sufficient to justify the seizure. Accordingly, I agree that the judgment of the trial court should be reversed and appellants dismissed from further prosecution.

Duff, J., concurring.

I concur in the reversal of the conviction for the reasons outlined in the majority opinion. In concurring, however, I wish to emphasize that I do not read the majority opinion as holding that in no case could a drug courier profile, observed by an experienced police officer, and properly articulated in court, form the basis of a valid investigative stop of an automobile. I could not subscribe to such a holding under what I perceive to be the present state of the law.

Cole, J., with whom Hodges, J. joins, dissenting.

The single issue raised by the appellants, Gifton Anthony Taylor and Charlton Malcolm, is whether the stopping of their rental vehicle on Interstate Highway 95 was an unreasonable seizure in violation of their rights under the fourth amendment of the United States Constitution. We dissent because we believe that the stop was constitutionally valid.

On appeal of a criminal conviction, a court must view the evidence in the light most favorable to the Commonwealth and accord to the evidence all reasonable inferences fairly deducible therefrom. *Dukes v. Commonwealth*, 227 Va. 119, 122, 313 S.E.2d 382, 383 (1984); *Crumble v. Commonwealth*, 2 Va. App. 231, 233, 343 S.E.2d 359, 361 (1986).

A conviction will be affirmed unless it appears from the evidence that it is plainly wrong or without evidence to support it. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975); *Henry v. Commonwealth*, 2 Va. App. 194, 197, 342 S.E.2d 655, 656 (1986).

The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict, and will not be disturbed on appeal unless plainly wrong or without evidence to support it. *Evans v. Commonwealth*, 215 Va. 609, 613, 212 S.E.2d 268, 271 (1975); *Crumble*, 2 Va. App. at 233, 343 S.E.2d at 361.

On October 5, 1985, Sergeant Ronald E. Puckett was part of a special detail patrolling Interstate Highway 95 North in search of motor vehicles transporting narcotics and drugs through Chesterfield County. Puckett had been an investigator in the narcotics division of the Chesterfield County Police Department for approximately five years prior to the events at issue. He was trained in narcotics investigation, and his professional experience included involvement in at least one hundred narcotics cases. Puckett had learned by experience that major drug dealers seldom transport their own merchandise; instead, individuals referred to as drug couriers or "mules" are employed to move wholesale quantities of drugs. In 1982, Puckett had travelled to Florida in the course of a narcotics investigation, and there he observed the use of Florida-registered rental cars to transport illegal drugs.

In August 1984, Puckett attended a detailed briefing given by the Virginia State Police on the problem of known illegal drug transportation through Chesterfield County on Interstate Highway 95. There Puckett learned of a number of characteristics that were typical of drug couriers. The date Puckett obtained at the briefing was less than one year old, having been compiled between December 1983, and August 1984. The specific traits and circumstances indicating illegal drug activity were collectively referred to as a "profile."

At the briefing, local narcotics investigators were advised to be alert for such characteristics as: (1) northbound travel on Interstate Highway 95, consistent with the known flow of illegal narcotics from Florida to the northeastern states; (2) vehicles riding low in the back, consistent with heavy cargo in the trunk; (3) Florida registered rental cars, indicated by appearance of the

letter "Z" on the license plate, consistent with a one way trip taken under an untraceable name; (4) a rental agreement or vehicle registration not in the real name of any vehicle occupant, consistent with anonymity; (5) little or no luggage, consistent with a quick trip; (6) luggage stowed in the rear passenger seat, consistent with a fully loaded trunk; (7) nervous behavior by occupants of the vehicle, consistent with guilty knowledge; (8) black or Hispanic male occupants, since experience indicated that most drugs originate in South and Central America and that couriers, in most instances, were of this ancestry; and (9) occupants ranging from twenty to thirty-five years of age.

During the first week of October 1985, Puckett was assigned to lead a five officer narcotics investigation detail assigned to a segment of Interstate 95 North running from the Colonial Heights toll booth to the northern boundary of Chesterfield County. On October 5, 1985, Puckett observed a four door Toyota with Florida rental plates as it headed north from the Colonial Heights toll booth. Two black men, who appeared to be between twenty and thirty-five years old, were in the car. The car appeared to be riding level and was moving at the speed limit. Puckett followed in an unmarked police car.

During the surveillance, which involved a total distance of four to five miles, the Toyota traveled at slightly less than the speed limit but its speed varied continually, presumably to avoid the presence of the unmarked police vehicle. Puckett decided to stop the Toyota for further investigation.

Generally, the battle against drug trafficking has taken place in several areas. The Border Patrol has the responsibility for all vehicle searches in the border areas to prevent illegal aliens and drugs from entering the country. However, only a small percentage of the drugs are intercepted at the border.[2] The remaining balance of the drugs enter the country to be distributed to drug dealers, and ultimately to drug users, in all of the major population centers. In an effort to deter the flow of drugs, law enforcement officials have placed an emphasis on interception at major train stations, airports and highways. The "drug courier profile" was developed by the Drug Enforcement Administration (DEA) to assist agents in

---

[2] *Annual Report for the Year 1986 of the Select Committee on Narcotics Abuse and Control*, House of Representatives Rep. No. 99-1039, 99th Cong. 2d Sess. pp.15-22.

identifying persons who are transporting drugs and narcotics on trains and commercial airlines; the profile also has been used to identify drug traffickers in the border areas. Therefore, as expected, the drug courier profile cases in these areas have proved informative in highway stop cases. We look to these cases for standards, guidelines, and procedures for highway spot checks that will meet the requirements of the fourth amendment and control the unconstitutional exercise of discretion by police officers. The principles established in the border, train and airport cases must be considered because we find no United States or Virginia Supreme Court cases directly on point.

A number of border cases were decided in the mid-1970s, but for the purpose of our analysis we have selected *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975) for discussion. The Border Patrol operated a fixed checkpoint on Interstate Highway 5 south of San Clemente, California. The checkpoint was closed because of inclement weather, but two officers were observing northbound traffic from a patrol car parked on the side of the highway. They pursued respondent's car and stopped it, saying their only reason for doing so was that the three occupants appeared to be of Mexican descent. The officers questioned respondent (Brignoni-Ponce) and his two passengers about their citizenship and learned that the passengers were aliens who had entered the country illegally. All three were arrested. At trial, respondent moved to suppress the testimony of and about the two passengers, claiming that this was the fruit of an illegal seizure.

The government demonstrated convincingly that the public interest demanded effective measures to prevent the illegal entry of aliens at the Mexican border. It cited the large number of aliens illegally in the country, and argued that they create significant economic and social problems, competing with citizens and legal resident aliens for jobs, and generate extra demand for social services. *Id.* at 878-79.

The Court recited that against this valid public interest it must weigh the interference with individual liberty that results when an officer stops an automobile and questions its occupants. It found that "[t]he intrusion is modest;" that a stop by a roving patrol usually takes no more than a minute; that there is no search of the vehicle or its occupants; and that the "visual inspection is limited to those parts of the vehicle that can be seen by anyone standing

alongside." The occupants only answer a brief question or two and possibly must produce a document evidencing a right to be in the United States. *Id.* at 880.

Weighing all of these factors, the Supreme Court found that, except at the border and its functional equivalents, officers on roving patrols may stop vehicles only if they were aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country. The Court, in further explanation, stated that any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area, such as: (1) characteristics of the area in which they encounter a vehicle; (2) proximity to the border; (3) usual patterns of traffic on the particular road; (4) previous experience with alien traffic; (5) information about illegal border crossings in the area; (6) the driver's behavior, such as erratic driving or obvious attempts to evade officers; (7) aspects of the vehicle itself, such as certain station wagons, with large compartments for fold-down chairs or spare tires; (8) vehicles that appear to be heavily loaded; (9) vehicles with an extraordinary number of passengers; (10) observation of people attempting to hide; (11) occupants of apparent Mexican ancestry, relying on such factors as the mode of dress and haircut. *Id.* at 884-85.

In *Brignoni-Ponce*, the officer based the decision to stop solely on the apparent Mexican ancestry of the occupants; the Court ruled that this information was insufficient to constitute reasonable grounds to believe that the three occupants were aliens. Accordingly, it suppressed the testimony of and about the two passengers.

Another leading case is *Delaware v. Prouse*, 440 U.S. 648 (1979). On November 30, 1976, a police officer stopped the vehicle in which the appellant Prouse was a passenger in order to check the driver's license and registration. The officer had not observed traffic or equipment violations, nor had he observed other suspicious activity. The officer made simply a random stop, not acting pursuant to any standards, guidelines, or procedures promulgated by either his department or the state Attorney General. As he walked toward the stopped vehicle, the officer smelled burning marijuana, and seized marijuana which he observed in plain view on the floor of the car. Prouse was indicted

and convicted for illegal possession of a controlled substance. The trial court granted a motion to suppress, finding that the stop and the detention were violative of the fourth amendment. The Delaware Supreme Court affirmed, holding that "a random stop of a motorist in the absence of specific articulable facts which justify the stop by indicating a reasonable suspicion that a violation of the law has occurred is constitutionally impermissible and violative of the Fourth and Fifth Amendments of the United States Constitution." *Id.* at 651. The United States Supreme Court granted *certiorari* to resolve a conflict among the circuits.

In *Prouse*, the State of Delaware argued that police officers should not be constrained when determining which motor vehicles to stop for license and registration checks because the state's interest in discretionary spot checks as a means of ensuring the safety of its roadways outweighed the resulting intrusion on the privacy and security of the persons detained. The Supreme Court relied on two border patrol cases, *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), and *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), to provide guidance when balancing the asserted public interest against the individual's fourth amendment interests implicated by the practice of spot checks.

The Court compared the public interest of Delaware in the safety of traffic on its highways against the individual fourth amendment rights of Prouse and held:

Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. This holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion

of police officers.

*Delaware v. Prouse*, 440 U.S. 648, 663 (1979).

In a concurring opinion, Justice Blackmun, joined by Justice Powell, asserted that the majority opinion "carefully protects from the reach of its decision other less intrusive spot checks that do not involve the unconstrained exercise of discretion." He suggested that roadblock stops of all traffic, and other purely random stops (such as every tenth car to pass a given point) would be permissible. *Id.* at 663-64.

*Prouse* terminated the practice of randomly stopping and detaining the driver of a motor vehicle in order to check his driver's license and registration. As a result law enforcement officers were faced with the problem of developing a method for spot checks not involving the unconstrained exercise of discretion.

*Brown v. Texas*, 443 U.S. 47 (1979), involved the stopping of a person. Two police officers, cruising in a patrol car, observed two men in an alley in a "high drug problem area." The officers saw nothing which gave rise to suspicion that appellant was engaged in misconduct or was armed. They stopped him because the situation "looked suspicious and we had never seen that subject in that area before."

The Supreme Court stated, as it had in *United States v. Brignoni-Ponce*, that the constitutionality of such seizures required a weighing of the public's interests served by the seizure against the severity of the interference with the individual's fourth amendment rights. It declared that a valid stop could be made according to the following standard:

> [T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers.

*Id.* at 51 (citations omitted).[3]

In *Brown*, the police officer could not point to any facts supporting his contention that the appellant "looked suspicious." In a footnote, the Court observed that "[t]his situation is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Id.* at 52 (citations omitted).

In a border stop case, *United States v. Cortez*, 449 U.S. 411 (1981), Chief Justice Burger discussed the investigatory stop as follows:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.

---

[3] The question was not raised by the Commonwealth whether the program of the Virginia State Police under the drug courier profile constitutes a plan embodying explicit, neutral limitations on the conduct of individual officers as suggested in *Brown*.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio, supra*, said that "[t]his demand for specificity in the information upon which police action is predicated is the *central teaching of this Court's Fourth Amendment jurisprudence.*"

*Id.* at 417-18 (citations omitted).

At this point we state some generalizations about profiles, which are not new in criminal jurisprudence. The first profiles related to physical characteristics. But, as criminals have become more sophisticated in their activities, law enforcement officials have had to respond. In response to illegal drug traffic, the idea of a drug courier profile first arose in the early seventies. The profile attempted to define behavioral characteristics of drug couriers, since law enforcement officials found it impossible to identify them from physical characteristics alone. An excellent portrayal of the drug courier profile is recited in *Grant v. State*, 461 A.2d 524 (Md. App. 1983) in an opinion by Judge Charles E. Moylan Jr.:

An additional preliminary word is also in order about the so-called "drug courier profile." It is a convenient descriptive term without a great deal of legal significance. Some lament the fact that the Supreme Court has not yet told us whether meeting the so-called "drug courier profile" is an adequate predicate to establish either articulable suspicion for a stop or probable cause for an arrest or search. Of course, the Supreme Court has not told us that and they never will. In-

deed, they cannot, for there is no such thing as a single drug courier profile; there are infinite drug courier profiles. The very notion is protean, not monolithic. *United States v. Mendenhall, supra*, refers to it as "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." It is simply an open-ended laundry list of more or less suspicious circumstances, some of which may occur in a particular case.

A large number of the more suspicious circumstances may well pass constitutional muster in a given case, whereas a smaller number of more ambiguous circumstances will not pass muster in another case. In *United States v. Mendenhall, supra*, the particular characteristics there present were deemed to be enough to establish articulable suspicion of a *Terry*-type stop. In *Reid v. Georgia*, 448 U.S. 438, 100 S. Ct. 2752, 65 L. Ed. 2d 890 (1980), a different collection of characteristics from the laundry list did not pass constitutional muster. Yet, in the next case, *Florida v. Royer*, 460 U.S. 491 (1983), a different collection of characteristics did pass constitutional muster. There is no inconsistency among these three cases.

It is rather the case that the suppression hearing judge and the reviewing court will look at the actual observations testified to on a case-by-case basis and will decide whether those observations add up to articulable suspicion and/or probable cause, just as if the phrase "drug courier profile" had never been coined. The only legal significance to this umbrella term called "the profile" is that the expertise of the police will be legitimately taken into consideration when we assess the significance of observations that might to the untrained layman seem completely ambiguous. The establishment of the profile by the Drug Enforcement Agency simply gives us the benefit of the collective expertise of many investigators working nationwide in this sensitive area of law enforcement. The special significance that a given observation might have to a trained and experienced policeman could always be established on a case-by-case basis, even if the "profile" did not exist.

*Id.* at 526 (citations omitted).

We must further consider the charateristics of the automobile itself. The "automobile exception" to the warrant requirement was first enunciated in *Carroll v. United States*, 267 U.S. 132 (1925). In *Carroll*, the privacy interests in the automobile were constitutionally maintained; however, the Court found that the mobility of the motor vehicle justified a lesser degree of protection. Additionally, later cases indicate a second reason for the automobile exception—the exception of privacy in an automobile is significantly less than in the home or office. *California v. Carney*, 471 U.S. 386, 390-91 (1985).

"As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni-Ponce*, 422 U.S. at 878. The interest of the Commonwealth and the federal government in deterring and eliminating drug trafficking on the highways is one of their highest priorities.

We must look to the magnitude of the governmental interest in drug control and compare it with the intrusion upon personal liberties of the individual. The drug problem in all fifty states of the United States is one of basic economics, supply and demand. The demand is created by drug abusers and those who experiment with drugs. The suppliers are the smugglers and traffickers that are seeking the fast, tax free dollars. The source in most instances is in another country. Law enforcement agencies generally recognize smuggling and trafficking of marijuana, cocaine, and other illegal drugs and the impact of this multibillion dollar industry as one of the major problems confronting our society today.

There also is an alarming increase of violence associated with drug trafficking. Incidents include armed confrontations between drug dealers, organizations, and more seriously, armed resistance on the part of the drug traffickers when confronted with arrest.

The billions of dollars generated by illicit drug trafficking has led to corruption both in the public and private sectors. This corruption, combined with violence and the adverse economic impact of drug trafficking, has created a societal problem equal to the

personal horrors of drug abuse itself. The news media on a daily basis are reporting such violence and corruption and the illicit drug traffickers are becoming increasingly more involved in the nation's financial organizations.

In 1976 the House of Representatives in the 94th Congress established the Select Committee on Narcotic Abuse and Control[4] whose purpose was "to conduct continuing oversight and review of the problems of narcotics, drugs, and polydrug abuse and control." It is the only congressional committee with the broad responsibility and authority to examine the problems of drug abuse and drug trafficking prevention and control in their entirety. The Select Committee's annual report for the year 1986 contains the following information concerning drug abuse and traffic of narcotic and psychotropic drugs in the United States:

> In 1984, $1.43 billion was appropriated for overall drug law enforcement by the Federal government; in 1985, approximately $1.65 billion; and for 1986, an estimated $1.7 billion. During this same period of time the dollar value of drug trafficking in the United States increased at an estimated rate of $10 billion per year as the quantities of cocaine, heroin, and marijuana smuggled from abroad increased, as did domestic marijuana production and the illicit manufacture and traffic of psychotropic drugs within the country.[5]

> Funding provided by the Federal government for all health related drug abuse prevention and treatment programs to educate and warn our children, youth and all citizens of the dangers of illicit drug usage and treat victims was about $355 million in 1984; $400 million in 1985; and $400 million in 1986.[6]

> In 1986, the drug trafficking industry in the United States continued to expand to an estimated $130 billion a year in-

---

[4]  H. Res. 1350, 94th Congress, adopted July 26, 1976.

[5]  *Annual Report for the Year 1986 of the Select Committee on Narcotics Abuse and Control*, House of Representatives Rep. No. 99-1039, 99th Cong., 2d Sess., page 11.

[6]  *Id.* at 11.

dustry. This underground economy spawns crime, violence and corruption; threatens legitimate business; diminishes industrial productivity and creates a serious drain on our national economy.[7]

In addition to human suffering, estimates of the social and economic costs of drug abuse prevention, treatment, related crime, violence, death, property destruction, lost productivity and drug enforcement will total an additional $100 billion.[8]

A 1985 survey of Americans age 12 and above, conducted by the National Institute of Drug Abuse reports that 70.4 million or 37 percent of that population have tried marijuana, cocaine, or other illicit drugs at least once in their lifetime; 36.8 million or 19 percent have done so in the last year; and 23 million or 12 percent of the population over age 12 report having tried illicit drugs at least once during the month prior to being surveyed.[9]

Among 20 to 40 year olds, according to the National Household Survey, 29 percent reported use of an illicit drug in the past year. Nineteen percent reported some use at least once in the past month.[10]

It is estimated that there are 600,000 active heroin addicts in the United States. Their number has been growing on an annual basis since 1979 as supplies in the way of quanitity and quality of the drug has gradually increased.[11]

About 25 million people are reported to use marijuana regularly in the United States and an additional 15 million may use it occasionally. As many as 62 million may have tried it at least once.[12]

---

[7]  *Id.* at 8.

[8]  *Id.* at 8.

[9]  *Id.* at 8-9.

[10]  *Id.* at 8.

[11]  *Id.* at 8.

[12]  *Id.* at 8.

An estimated 30 million are occasional users of cocaine in this country with an estimated 700,000 to 1,400,000 addicted to the substance. Estimates of the number of regular users of cocaine in 1986 range from 6 to 8 million compared to 4.2 million in 1982.[13]

In commenting upon the involvement of government at the state and local levels, the Select Committee reports:

The inability of the Federal Government to prevent the entry and distribution of marijuana, cocaine and heroin nationwide has created a drug trafficking and abuse problem of such proliferation and volume that it overwhelms the state and local criminal justice and drug abuse prevention and treatment systems. It is in our local communities where the degradation and destructiveness of chronic drug abuse with its crime and violence takes its human toll. State and local police, narcotic enforcement services, prosecuting attorneys, courts and judges and prison systems lack the personnel, facilities, equipment and funding to effectively suppress the wholesale and retail drug trafficking and related crime infecting these jurisdictions. In this environment drug abuse flourishes.

*Id.* at 13.

"[T]he reasonableness of seizures, less intrusive than traditional arrests, depends on a balancing test." *Lowe v. Commonwealth*, 230 Va. 346, 350, 337 S.E.2d 273, 275-76 (1985), *cert. denied*, 475 U.S. 1084 (1986). This test "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985). "A seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual. . . ." *Lowe*, 230 Va. at 350, 337 S.E.2d at 276 (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). The United States Supreme Court has applied the *Terry* balancing test specifically to highway stops:

---

[13]  *Id.* at 8.

Although stopping a car and detaining its occupants constitute a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion.

*Hensley*, 469 U.S. at 226.

The Supreme Court has explicitly found the intrusion occasioned by highway automobile stops "modest" and "minimal" where the stops were made in order to conduct a brief investigatory inquiry, as in the case under review. *Brignoni-Ponce*, 422 U.S. at 880, 881; *cf. United States v. Martinez-Fuerte*, 428 U.S. 543, 557-58 (1976) (applying *Brignoni-Ponce*). Moreover, analogizing fifth amendment coerciveness issues in highway stop cases to fourth amendment intrusiveness issues in such cases, the Supreme Court observed: "[M]ost traffic stops resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*." *Berkemer v. McCarty*, 468 U.S. 420, 439 n.29 (1984) (holding that traffic stops do not require *Miranda* warnings because they are minimally coercive). We conclude that the stop at issue in this case entailed only a minimal intrusion.

Conversely, the public interest in this case is anything but minimal. Interstate 95 is one of America's busiest highways, a major artery along which, as Puckett's information indicated, wholesale shipments of illegal narcotics flow from Florida to the northeastern states. The United States Supreme Court has eloquently stated the importance of stopping this flow:

*The public has a compelling interest* in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

*United States v. Mendenhall*, 446 U.S. 544, 561-62 (1980) (plurality opinion) (emphasis supplied); *see also United States v. Place*, 462 U.S. 696, 703-04 (1983) (airport stop context). Where the governmental interest is strong and the difficulty of protecting that interest is great, courts must be particularly sensitive to the legitimate needs of law enforcement.

This case is a paradigm of the difficulty involved in detecting illegal narcotics transportation. Unlike the situation in airport concourses, an officer observing a moving car cannot request information necessary to confirm or dispel his suspicions without first effecting a seizure. *Cf. Mendenhall*, 446 U.S. at 553-54 (officer able to approach and question suspect without implicating fourth amendment). The United States Supreme Court has recognized the heightened difficulties that the highways pose for law enforcement in an analogous smuggling context, noting that "the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens." *Martinez-Fuerte*, 428 U.S. at 557 (approving use of routine checkpoint stops sixty-six miles north of Mexican border even where reasonable suspicion completely absent). In balancing the interests in this case, even more weight should be accorded the public interest than in *Mendenhall*, because drug enforcement on major highways is even more difficult than in airport concourses.

If the public interest in drug detection is given its due weight, courts must also confront the inherent subtlety of the recognizable characteristics of narcotics traffickers, particularly those travelling on interstate highways. As the subtlety of the observable clues increases, the weight given to the investigating officer's knowledge and experience must also increase. Evidence that might appear meaningless to an untrained person can support a stop by a knowledgeable officer. *See Cortez*, 449 U.S. at 418. A trained and experienced officer will be familiar with "the modes or patterns of operation of certain kinds of lawbreakers." *Id.* Drug courier profiles are nothing more than the modes or patterns of operation of narcotics traffickers, learned from experience, which enable officers to identify particular suspects, and from which an officer can also develop an articulable basis to stop a suspect.

In this case, we must examine the whole picture, the totality of the evidence, to determine whether Officer Puckett had specific

articulable facts that reasonably warranted a suspicion that the appellants' vehicle contained drugs and they were actually participating in criminal activity at the time.

The first consideration is location of the surveillance. The nature of the area in which a vehicle is encountered is an important fact supporting reasonable suspicion. *See Brignoni-Ponce*, 422 U.S. at 884-85. Information about recent illegal traffic in an area under surveillance can support an officer's reasonable suspicion. The appellants were travelling north on Interstate 95, a high-speed, limited access thoroughfare from Florida to the northeastern states; Puckett, from his experience and training, knew that the highway was a major drug source and distribution area. He chose to observe the northbound lane of Interstate 95 for these reasons.

From his observation post, Puckett observed a Toyota headed northbound bearing a Florida license plate, and equally as important, the plate contained the letter "Z" which indicated that the vehicle was a rental car. Thus, Puckett had objective data to indicate to him that this was a Florida registered rental vehicle. The appellants contend that this fact has no significance and persons from Florida have a right to the use of the highways to travel and vacation as they see fit. However, Officer Puckett from his experience and training knew that there were not many motor vehicles from Florida travelling on Interstate 95 in Chesterfield County, and even fewer who were there driving a rental car. These are factors that he had a right to consider in determining whether reasonable suspicion existed for an investigatory stop.

Puckett was an experienced police officer, trained in narcotics investigation, and his professional experienced involved at least 100 narcotics cases. He had experience in investigations in Florida. He had been briefed recently by the Virginia State Police, who had advised him that drug couriers tend statistically to be black or Hispanic and between twenty and thirty-five years of age. On this occasion, the appellants appeared to Puckett to be black and within the age group that experience and training indicated to him might be drug couriers. In *Fouche v. United States*, 776 F.2d 1398 (9th Cir. 1985), an officer received a description of a robbery suspect as a black male with a short afro hairstyle, last seen running from the crime scene. Shortly thereafter, the officer

saw a car near the scene being driven by a black man with a short afro hairstyle, who was "looking around suspiciously." 776 F.2d at 1401. The court held that "although race or color alone is not a sufficient basis for making an investigatory stop racial appearance may be considered as a factor contributing to a founded suspicion of criminal conduct." 776 F.2d at 1402-03 (citations omitted). *Accord Brignoni-Ponce*, 422 U.S. at 885 ("characteristic appearance of persons who live in Mexico" can be a supporting fact in border-area highway stops); *see Martinez-Fuerte*, 428 U.S. at 563 (referral to second, more intrusive checkpoint, based solely on apparent Mexican ancestry, held reasonable even though no particularized suspicion existed at first checkpoint). The same principle applies in this case. Puckett was entitled to consider defendants' racial appearance in deciding whether to investigate further.[14] This information, together with the apparent age group characteristics, further supports the reasonableness of Puckett's decision to stop the car.

Puckett first observed the appellants' vehicle at the Colonial Heights toll booth. Pulling parallel with the moving Toyota on the driver's side, Puckett saw the driver "cut his eyes" toward the unmarked car and slightly decrease the Toyota's speed. When asked by the trial court at the suppression hearing to articulate his basis for concluding that the driver was "concerned or nervous," Puckett said: "It would merely be him cutting his eyes, not looking directly at me, cutting his eyes, and his speed varying and so forth."

After traveling less than a mile alongside appellants' car at slightly below the speed limit, Puckett dropped back and moved to the passenger's side, whereupon both occupants "cut their heads back" and again "cut their eyes" in Puckett's direction. On cross-examination, Puckett maintained that appellants' nervous behavior revealed an extraordinary concern about his presence, beyond the reaction expected of a typical driver and passenger. During the surveillance, which involved a total distance of four to five miles travelling at slightly less than the speed limit, the Toyota's speed varied continually. Puckett decided that the Toyota should

---

[14] We emphasize that the apparent racial identity of a suspect is simply one factor which, based upon the circumstances of this case, may be considered. Nothing herein should be construed to sanction the wholesale use of such information in other types of investigations, nor should this opinion be construed to sanction a drug-related stop based solely on racial characteristics.

be stopped for investigation.

Charlton Anthony Malcolm was at the wheel of the stopped Toyota. Puckett identified himself and obtained Malcolm's driver's license and rental agreement. According to the rental agreement, the Toyota was rented to a Mr. Smith. After giving Malcolm the *Miranda* warnings, Puckett inquired about the name on the rental agreement. Malcolm explained that he was driving the car for his friend, "Mr. Smith." Puckett advised the appellants that he was investigating the illegal transportation of drugs, and asked permission to search the car. Both men signed a written consent form prepared by Puckett at the scene.

While Puckett prepared the consent form, another officer led a drug detection dog around the outside of the Toyota. Within five to eight minutes after the car had been pulled over, the drug dog signaled the presence of drugs. The officers searched the Toyota, and in the trunk they found seven packages which, upon later analysis, was found to be approximately 173 pounds of marijuana. Both Malcolm and Taylor were arrested and subsequently convicted of conspiring to possess and possession of marijuana with intent to distribute.

The majority opinion cites the general principle that before a vehicle may be stopped by a police officer on a highway, there must be "specific objective facts indicating that society's legitimate interests require the seizure of the particular individual" or the vehicle must be stopped "pursuant to a plan embodying explicit neutral limitations on the conduct of indivdual officers." By their holding, they have concluded that a drug courier profile compiled by the police from research data of behavioral characteristics of drug couriers does not constitute specific objective facts sufficient to stop a vehicle for further investigation. The majority opinion further concludes in this case that the existence of the drug courier profile plus the testimony of an experienced police officer experienced in narcotic investigations, that the appellants' behavior revealed an extraordinary concern about his presence beyond the expected reaction of a typical driver and passenger, was not sufficient to justify a stop for investigation. This decision eliminates the drug courier profile as a tool in the hands of law enforcement officials to fight drug trafficking on the highways. The practical result of the majority decision is that the police must have some specific physical evidence that the drug courier is in the

process of committing a criminal act before his vehicle can be stopped. Of necessity, this would require sufficient evidence to constitute probable cause to arrest before a motor vehicle could be stopped for investigation. Under the holding of the majority, the police would have to observe the drug courier violating a traffic law before stopping the vehicle. This seldom occurs because the drug couriers are mindful that they can be arrested for traffic violations and seldom fail to meticulously abide by all traffic regulations. The majority leaves the police officers with no effective means to stop a vehicle upon the highways to investigate drug violations.

The majority in its opinion makes no attempt to balance the nature and quality of the "modest" and "minimal" intrusion on personal security against the compelling interest of society in detecting those who traffic in drugs for profit in order to determine the reasonableness of the stop. When we balance the overwhelming governmental interest in deterring and terminating the illicit drug trafficking in this country against the minimal intrusion upon the fourth amendment rights of the appellants in the case at bar, we conclude that there is sufficient credible evidence in the record to support the finding of the trial court that the stop was reasonable under the totality of the circumstances and the officer possessed the requisite reasonable, articulable suspicion of criminal activity when he stopped the motor vehicle for investigative purposes.

For the foregoing reasons, we would affirm the convictions.