COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Willis and Annunziata
Argued by teleconference


COMMONWEALTH OF VIRGINIA

v.     Record No. 0619-98-4

BENJAMIN S. CREWE

COMMONWEALTH OF VIRGINIA

v.     Record No. 0620-98-4

PADERIC HOWELL CONROY                    MEMORANDUM OPINION[*] BY
                                  CHIEF JUDGE JOHANNA L. FITZPATRICK
COMMONWEALTH OF VIRGINIA                    AUGUST 25, 1998

v.     Record No. 0621-98-4

PHILIP C. MANISCALCO

COMMONWEALTH OF VIRGINIA

v.     Record No. 0622-98-4

MICHAEL R. CAROSELLA


                FROM THE CIRCUIT COURT OF STAFFORD COUNTY
                      James W. Haley, Jr., Judge

          Eugene Murphy, Assistant Attorney General
          (Mark L. Earley, Attorney General, on brief),
          for appellant.

          Clifford Y. Rose (Rose & Wall, P.C., on
          brief), for appellee Benjamin S. Crewe.

          Benjamin H. Woodbridge, Jr. (Woodbridge &
          Reamy, on brief), for appellee Paderic Howell
          Conroy.

          Arthur L. Grace for appellee Philip C.
          Maniscalco.

          (Albert H. Jacoby, on brief), for appellee

---

          [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

Michael R. Carosella.

Benjamin S. Crewe and Paderic H. Conroy (appellees) were each indicted on three counts of grand larceny and one count of throwing a missile at an occupied vehicle. Philip C. Maniscalco and Michael R. Carosella (appellees) were each indicted on three counts of grand larceny, one count of throwing a missile at an occupied vehicle, and one count of felony destruction of property. Appellees filed pretrial motions to suppress their statements and property turned over to police, arguing: 1) the police officer's investigatory stop of their vehicle was unlawful, and 2) their subsequent statements were tainted as fruit of the illegal stop. The trial court granted the suppression motions, and the Commonwealth appeals pursuant to Code § 19.2-398(2). For the following reasons, we reverse.

I.

At 4:03 a.m. on July 23, 1997, the Stafford County Sheriff's Office received a call from a clerk at a 7-Eleven store requesting that the police investigate suspicious activity outside the store. The clerk indicated that four individuals had exited a white Ford Explorer, and two were outside at the rear of the store and two were at the side of the store. The police dispatcher relayed this information to Deputy Mike Jenkins, who arrived at the store approximately ten seconds later. Jenkins testified that although the location of the 7-Eleven was not a

high crime area, the early morning hours were the "most dangerous" for twenty-four-hour convenience stores, and the clerk's description of the individuals' behavior was "a classic example of people casing the area."

As Jenkins turned into the 7-Eleven parking lot, he saw a white Ford Explorer leave the lot and drive onto Route 3. He saw the driver's eyes widen in "a surprised facial expression." The officer scanned the parking lot, noting that the clerk was in the store and no other individuals or vehicles were present. As Jenkins turned to follow the truck, the passengers in the truck watched him, and he recognized Crewe, who was sitting in the right rear seat, as a former jail inmate. Jenkins followed the truck on Route 3 for approximately two-tenths of a mile and observed the passengers in the rear seat "leaning forward" with "furtive movements," as if they were putting something under the seat or in the side panel. The officer requested additional information from the dispatcher regarding the suspicious circumstances call from the store clerk, but the dispatcher had nothing further to report. Jenkins also attempted to check the license tag number of the vehicle, but because it was a temporary tag, he was unable to acquire information about the owner. He observed no traffic or other violations, but based on the reported suspicious activity, the driver's surprise, and the passengers' furtive movements, Jenkins suspected "possible criminal activity," and he initiated a traffic stop.

During the traffic stop, Jenkins checked the identification of each of the five occupants, the four appellees and a juvenile, C.W. Jenkins also searched the truck and photographed the contents, which included long-handled screw drivers, baseball bats, gloves, a flashlight, automobile compact disc players, compact disc player face plates, golf clubs, a cellular phone, sunglasses, two cases of compact discs, and several cans of Surge, a sports drink. After approximately twenty minutes, the officer allowed the occupants of the truck to leave without making an arrest or issuing a summons. The traffic stop concluded at approximately 4:30 a.m.

At approximately 5:00 a.m., Deputy Jenkins was advised of multiple reports of vandalism and items having been stolen from cars. One report involved a store window that had been broken with a Surge soda can, and a second report described someone in a vehicle throwing a Surge can at another vehicle on the road. Additional reports of stolen items, including golf clubs and automobile compact disc players, matched Jenkins' recollection of the items he observed in the white Ford Explorer.

Between 8:00 and 8:30 a.m., Deputy Jenkins, accompanied by several deputies, went to the home of Conroy, the owner and driver of the white Explorer. Jenkins asked Conroy whether he knew why they were there, and he said that he did. The officer then told Conroy that "[t]here was a lot of damage done last night, vandalism done last night, and that's what we're here to

-4-

talk about."  Conroy was advised of his rights under <u>Miranda</u>, completed a voluntary statement form, and gave written and oral statements implicating himself, Crewe, Maniscalco, Carosella, and C.W. in numerous offenses committed earlier that evening.  Conroy then showed the deputies some of the stolen compact discs located in his bedroom and told them Maniscalco had left with the rest of the stolen property.

When the officers conducted a consensual search of the bedroom they found Crewe hiding under the bed.  When asked why he was under the bed, Crewe replied that he did not want to go to jail.  The deputies advised Crewe of his rights under <u>Miranda</u> and told him that Conroy had given them written and oral statements about the events of the evening.  Crewe completed a voluntary statement form and gave written and oral statements which implicated the other occupants of the vehicle.

Before leaving, Deputy Jenkins asked Conroy to contact the others and have them all come to the police station for questioning that night at 9:30 p.m. and to bring any stolen property with them.  Conroy and Crewe arrived at the station at approximately 10:00 p.m. that evening.  Deputy Jenkins again advised Conroy and Crewe of their rights under <u>Miranda</u> and that neither was under arrest when he interviewed them for the second time.  Conroy gave an oral statement implicating Carosella, Maniscalco, and C.W.  Crewe stated that the idea to break into the cars was mutual and further implicated Maniscalco and C.W.

-5-

While Jenkins did not arrest either Conroy or Crewe at that time, he told them he would be obtaining warrants for their arrest and he would give them until 8:00 p.m. on the next day to get back to him and to bring in any stolen items. Conroy gave no further statement and had no additional contact with police until his arrest. He did not give a post-arrest statement. Crewe was arrested on July 30, 1997, and his post-arrest statement was videotaped at the police station.

At approximately 3:00 a.m. on July 24, 1997, nearly twenty-four hours after the initial stop, Maniscalco and Carosella arrived at the police station. As Deputy Jenkins met them in the lobby, before he asked them any questions, Carosella gave him one of the stolen compact disc player face plates.

Jenkins advised Maniscalco and Carosella of their rights under Miranda. Both appellees signed voluntary statement forms and provided statements implicating each other as well as Crewe, Conroy and C.W. In response to Jenkins' question whether he possessed any additional property taken from the vehicles that night, Maniscalco retrieved the stolen golf clubs from the trunk of his car. When Jenkins asked where the rest of the stolen property was, Maniscalco replied that it was at Carosella's house. After advising Maniscalco and Carosella that he would be obtaining warrants for their arrest and they had until 8:00 p.m. to get back to him and to bring in any additional stolen items, Jenkins concluded the interviews. None of the appellees appeared

at 8:00 p.m. on July 24 as Jenkins had requested.

In the course of an interview with C.W. on July 27, 1997, Deputy Jenkins learned for the first time that Maniscalco and Carosella had been involved in two incidents of vandalism at the county garage during the month of February. On July 28, 1997, when Maniscalco notified Jenkins that he would be bringing more stolen property to the police station, Jenkins invited Detective Ernie Jones, the investigating officer on the county garage offenses, to be present during the interview.

Maniscalco arrived on July 28 and immediately turned over a plastic bag with several stolen items in it. Deputy Jenkins informed Maniscalco that he had a warrant for his arrest, but he did not execute the warrant. Jenkins and Detective Jones advised Maniscalco of his rights under Miranda and conducted an interview, during which Maniscalco made incriminating statements concerning his involvement in the July 23 offenses and the county garage offenses. He was allowed to leave with the agreement that he would return the following day. He did return the following day, July 29, 1997, and was again advised of his rights and interviewed by Detective Jones. Maniscalco gave additional incriminating statements about the July 23 offenses and the county garage offenses. At the close of the July 29 interview, Maniscalco was arrested and taken into custody.

Carosella had no further contact with police until August 5, 1997, when he gave a post-arrest statement describing his

involvement in both the July 23 vandalism and the county garage offenses.

After a hearing limited to the issue of the reasonableness of the stop, the trial court issued a letter opinion enumerating the undisputed facts. Relying on Ewell v. Commonwealth, 254 Va. 214, 491 S.E.2d 721 (1997), the trial court concluded that "the totality of these facts do not, and did not, grant the police officer a reasonable suspicion" of criminal activity.

## II.

The threshold question is whether the officer had reasonable suspicion of criminal activity when he stopped the vehicle. "'Ultimate questions of reasonable suspicion and probable cause' . . . involve questions of both law and fact and are reviewed de novo on appeal." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (quoting Ornelas v. United States, 517 U.S. 690, 691 (1996)). Consequently, we review the undisputed facts and the trial court's application of the relevant law de novo.

"'[W]hen the police stop a motor vehicle and detain an occupant, this constitutes a seizure of the person for Fourth Amendment purposes.'" Logan v. Commonwealth, 19 Va. App. 437, 441, 452 S.E.2d 364, 367 (1994) (quoting Zimmerman v. Commonwealth, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988)). "In order to justify an investigatory stop of a vehicle, the officer must have some reasonable, articulable suspicion that the vehicle

or its occupants are involved in, or have recently been involved in, some form of criminal activity." Logan, 19 Va. App. at 441, 452 S.E.2d at 367. "Actual proof that criminal activity is afoot is not necessary; the record need only show that it may be afoot." Harmon v. Commonwealth, 15 Va. App. 440, 444, 425 S.E.2d 77, 79 (1992).

"To determine whether an officer has articulated a reasonable basis to suspect criminal activity, a court must consider the totality of the circumstances, including the officer's knowledge, training, and experience." Freeman v. Commonwealth, 20 Va. App. 658, 661, 460 S.E.2d 261, 262 (1995). We may also consider "'the "characteristics of the area" where the stop occurs, the time of the stop, whether late at night or not, as well as any suspicious conduct of the person accosted such as an obvious attempt to avoid officers or any nervous conduct on the discovery of their presence.'" Commonwealth v. Thomas, 23 Va. App. 598, 611, 478 S.E.2d 715, 721 (1996) (quoting Smith v. Commonwealth, 12 Va. App. 1100, 1103, 407 S.E.2d 49, 51-52 (1991)).

Additionally, we acknowledge that "'a trained law enforcement officer may [be able to] identify criminal behavior which would appear innocent to an untrained observer.'" Freeman, 20 Va. App. at 661, 460 S.E.2d at 262 (quoting Taylor v. Commonwealth, 6 Va. App. 384, 388, 369 S.E.2d 423, 425 (1988)). For example, in Logan v. Commonwealth, the only evidence

providing reasonable suspicion was a broken vent window in the defendant's vehicle.  19 Va. App. 437, 452 S.E.2d 364 (1994).  We held that the stop was lawful based on the officer's testimony that "[h]er experience and training suggested that a broken vent window on this type of vehicle often indicated that the vehicle had been broken into and stolen."  Id. at 439-40, 452 S.E.2d at 366.

In the instant case, a vehicle carrying at least four passengers drove into a 7-Eleven parking lot at 4:00 a.m.  After exiting the vehicle, two pairs of occupants walked around the 7-Eleven, one pair going to the side and the other to the rear of the building.  There was no reported attempt to enter or approach the building's public entrance.  Deputy Jenkins testified that in his experience these actions comprised a classic example of individuals casing a store.  Jenkins was also aware that the store clerk had reported this activity and requested assistance during the most dangerous time for an all-night convenience store.  As Jenkins arrived on the scene to investigate these unusual circumstances, the officer observed the white Ford Explorer described by the store clerk leaving the parking lot and a surprised expression on the driver's face as he noticed the officer's presence.  Once Jenkins began to follow the vehicle, the passengers turned to look at him and made furtive gestures, as if they were concealing items.  At this time, Jenkins also recognized one of the passengers as a former jail inmate.  Based

on these facts, Jenkins made an investigatory stop of the vehicle.

Citing Ewell v. Commonwealth, 254 Va. 214, 491 S.E.2d 721 (1997), appellees contend the stop was unlawful because the officer lacked an articulable reasonable suspicion that the occupants of the vehicle were engaged in criminal activity. However, the instant facts are distinguishable from the facts of Ewell, in which the Supreme Court suppressed evidence seized as a result of an unlawful stop.  In Ewell, an officer entered a parking lot around 12:30 a.m. and noticed a vehicle parked next to an apartment suspected of being the site of narcotics activity.  The officer focused his attention on the vehicle because he did not recognize the car or its driver, Ewell, as a resident of the adjoining apartment complex.  Moreover, Ewell attempted to leave the parking lot immediately upon the officer's arrival.  Based on these facts the officer stopped the vehicle. The Supreme Court found that the stop violated the Fourth Amendment because "nothing about Ewell's conduct was suspicious." Id. at 217, 491 S.E.2d at 723.  The Court emphasized this by stating that "Ewell acted as any other person might have acted under similar circumstances."  Id.

In the case before us, the officer stated the following facts as the basis of the stop.  Deputy Jenkins arrived at the twenty-four-hour convenience store in response to a call about suspicious behavior in its parking lot.  This suspicious behavior

consisted of four men exiting a parked vehicle and walking around to the side and rear of the store at 4:00 a.m., the most dangerous time in the operation of such a business.  Upon arrival, the officer focused his attention on appellees' vehicle not because he thought it did not belong there, but because the store clerk specifically described the vehicle.  Moreover, rather than acting "as any other person might have acted under similar circumstances," id., the occupants of the vehicle displayed surprise and "'nervous conduct on discovery of [the presence of the officer].'"  Thomas, 23 Va. App. at 611, 478 S.E.2d at 721 (citation omitted).

For the foregoing reasons, we hold that the totality of the circumstances disclose articulable facts both before and after the officer's arrival that justified his reasonable suspicion and the investigatory stop.[1]  Consequently, the decisions of the trial court are reversed.

Reversed and remanded.

---

[1]The Commonwealth also appealed the trial court's ruling that appellees' statements and the property they turned over to police were inadmissible fruit of the illegal investigatory stop. In light of our holding that the investigatory stop was justified by reasonable articulable suspicion, the admissibility of evidence obtained subsequent to the stop is moot, and we need not address it.