404 S.E.2d 919 (1991)
James Patrick CARSON
v.
COMMONWEALTH of Virginia.
Record No. 0541-89-3.
Court of Appeals of Virginia.
May 14, 1991.
Rehearing En Banc Granted June 27, 1991.
Roger Allan Inger, Warrenton, for appellant.
Thomas C. Daniel, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., on brief), for appellee.
Present: BARROW, BENTON and COLEMAN, JJ.
BARROW, Judge.
Appealing convictions for possession of marijuana with intent to distribute and possession *920 of cocaine with intent to distribute, the defendant contends the arresting officer violated his fourth amendment rights when the officer approached the defendant's car as it stopped at a toll booth, seized a cut-off straw from between the driver's legs and then searched the trunk of the defendant's car. We disagree and hold that the police officer had a right to walk up to the defendant's car stopped in a public place. We also hold that the officer satisfied the requirements of the plain view doctrine in seizing the straw. Finally, we hold that the discovery of white powder residue on the straw gave the officer probable cause to search the trunk of the car.
The arresting officer testified that he was standing at an exact change toll booth on Interstate 95 when a vehicle in which the defendant was a passenger approached. As the vehicle came through the toll booth, the officer said that he took one step closer to the vehicle and that "[a]s ... [the driver] paid his toll, I looked into the vehicle and began to have a conversation with him, and about the same time I started the conversation, I noticed on the seat between the driver's legs ... what appeared to be about a one-and-a-half to two inch straw...." From his past experience in drug enforcement work, the officer recognized the straw as the type "that people use to ingest cocaine through their nose." He then "reached into the vehicle and retrieved the straw" because he feared the subjects might try to flee. Noticing a white powder residue on the straw, the officer instructed the driver of the car to pull to the side of the road. He searched the trunk of the car and found almost two pounds of marijuana and slightly more than two kilograms of cocaine.

I. THE OFFICER'S APPROACH AT THE TOLL BOOTH
We disagree with the defendant's assertion that Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), is the controlling authority in this case. In Prouse, the Court held that the stop of a vehicle on the highway to check the driver's license and automobile registration is a seizure for fourth amendment purposes; such a stop is unconstitutional unless accompanied by an articulable and reasonable suspicion or performed pursuant to a plan designed to limit police discretion. Id. at 663, 99 S.Ct. at 1401.
Here, the police officer did not stop the defendant's automobile. The officer had a legal right to be at the public toll booth. By placing himself there, the officer did not create a roadblock, as the defendant contends. It was the toll booth, not the officer, that stopped the car. Every vehicle on the highway is required to stop to pay the toll.
By looking in the car to speak to the occupants, the officer did not impede traffic or, in any other way, require the car to stop. He did not block the car's passage or touch the car. He was standing on a raised curb beyond the toll machine when he bent down and said, "Where are you coming from?" He did not signal the driver to stop; therefore, the driver was not obligated to do so. See Code §§ 46.2-102 and 46.2-817. He did not violate the fourth amendment by approaching the occupants of the car in a public place and asking them a question. See Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Richards v. Commonwealth, 8 Va.App. 612, 615, 383 S.E.2d 268, 270 (1989). Thus, before taking the straw, the officer did nothing to seize or detain the car or its occupants.
The fact that a police officer changes his position to look inside a legitimately stopped vehicle "is irrelevant to Fourth Amendment analysis." Texas v. Brown, 460 U.S. 730, 740, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502 (1983). Since the general public can peer into the interior of an automobile "from any number of angles," an officer is not precluded from looking into an automobile to observe "what would be entirely visible to him as a private citizen." Id.
*921 Furthermore, a police officer's approach of a person seated in a vehicle located in a public place does not constitute a seizure. 3 W. LaFave, Search and Seizure § 9.2(h) (2d ed. 1987). In Isam v. State, 582 S.W.2d 441 (Tex.Crim.App.1979), the defendant was a passenger in a vehicle when a police officer saw what appeared to be a marijuana cigarette in the defendant's hand. The officer approached the defendant's vehicle on foot as it stopped for a traffic light. The officer then smelled the odor of marijuana and directed the driver to pull over to the side of the road where the defendant was arrested. On appeal, the defendant contended that the officer's approach of the vehicle was "investigative and violated the appellants' constitutional rights." Id. at 444. The court disagreed, holding that the defendant's vehicle was stopped by the traffic light and not "by any overt action on the part of the police officers." Id.
Also instructive is State v. Harlan, 301 N.W.2d 717 (Iowa 1981), where the police officer, without any reasonable suspicion, followed the defendant's vehicle for several blocks and eventually approached the defendant's vehicle on foot after the defendant stopped to pick up a passenger. The defendant had not exited his vehicle or turned off its engine when the officer approached. Shining a flashlight into the vehicle, the officer observed the defendant's bloodshot, watery eyes and smelled alcohol on the defendant. The defendant was arrested for driving under the influence of alcohol. The court concluded that the officer's actions did not constitute a seizure because "[t]he officer, like any other citizen, had a right to look into the car." Id. at 720. The court distinguished Prouse on the ground that there was no evidence that the officer stopped the car or that he restrained its movement. Id.
Similarly, in this case, the officer did not stop the defendant's car or restrain its movement before seeing and taking the straw. Therefore, we conclude that the officer's approach of the defendant's car as it stopped at the toll booth was not a seizure.

II. THE SEIZURE OF THE STRAW
Until recently, three requirements were needed to justify a warrantless seizure of an item in plain view: (1) a police officer must be lawfully in a position to view and seize the item; (2) the discovery of the item must be inadvertent; and (3) it must be immediately apparent that the item may be evidence of a crime. Cantrell v. Commonwealth, 7 Va.App. 269, 283, 373 S.E.2d 328, 335 (1988), cert. denied, ___ U.S. ___, 110 S.Ct. 2600, 110 L.Ed.2d 280 (1990) (citing Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Recently, however, the United States Supreme Court has made clear that inadvertence, even though "a characteristic of most legitimate `plain view' seizures ... is not a necessary condition." Horton v. California, ___ U.S. ___, 110 S.Ct. 2301, 2304, 110 L.Ed.2d 112 (1990). We need not, therefore, concern ourselves with whether the officer's discovery of the cut-off straw was inadvertent. Instead, we must only determine if there is evidence from which the trial court could have found that the remaining two conditions justifying a warrantless seizure of evidence in plain view were present.
The evidence supports the trial court's finding that the officer had a legal right to walk up to the defendant's car as it stopped at the toll booth and, thus, the officer was in a place where he had a lawful right to be when he saw the straw. The officer's right to seize the straw depends, however, on whether the incriminating nature of the cut-off straw was immediately apparent.
In Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion), the Court equated the "immediately apparent" requirement with probable cause in the ordinary plain view seizure case.[1]Id. at 742, 103 S.Ct. at 1543. The Court stated that "probable cause is a flexible, *922 common-sense standard ... [which] merely requires that the facts available to the officer would `warrant a man of reasonable caution in the belief' ... that certain items may be ... useful as evidence of a crime." Id. (citation omitted). Applying this standard, the Court held that a police officer's plain view seizure of an uninflated, tied-off balloon was supported by probable cause where the officer testified that he was aware in his experience that balloons tied in this manner were frequently used to carry narcotics and where the officer observed other incriminating items in the defendant's glove compartment. Id. at 743, 103 S.Ct. at 1543-44. The Court stated that "the distinctive character of the balloon itself spoke volumes as to its contentsparticularly to the trained eye of the officer." Id.
In this case, the officer testified that he knew from his past experience as a narcotics investigator that the cut-off straw he saw in between the driver's legs was "the type straw that people use to ingest cocaine through their noses." The distinctive character of the straw coupled with the officer's experience "would warrant a man of reasonable caution" to believe that the straw might be useful as evidence of a crime.
This case is distinguishable from Harris v. Commonwealth, 241 Va. 146, 154-55, 400 S.E.2d 191, 196 (1991), where the Court held that a police officer's experience-based knowledge that certain people keep narcotics in film canisters falls short of establishing probable cause to search a suspect's film canister. Id. at 154, 400 S.E.2d at 196. The Court reasoned that "law-abiding citizens, on a daily basis, also use film canisters to store film, which is a legitimate use." Id. In contrast, the item seized in this case is a one and one-half to two inch straw. The uniqueness of the straw's size distinguishes it from straws one would usually encounter for legitimate purposes. See Brown, 460 U.S. at 746, 103 S.Ct. at 1545 (concurring opinion).
Although possible, it is highly unlikely that a straw this size would have a legitimate use. Even assuming a legitimate use exists for a straw this size, probable cause to believe the straw is evidence of a crime may nonetheless be established. Even the uninflated, tied-off balloon in Texas v. Brown may have been simply a remnant of a birthday party and not an item used for carrying narcotics. However, an investigating officer does not have to "deal with hard certainties, but with probabilities," and is permitted to make "common-sense conclusions about human behavior" in assessing a situation. Id. at 742, 103 S.Ct. at 1543.
The Sixth Circuit dealt with this issue in United States v. Truitt, 521 F.2d 1174 (1975), where the police officer, while executing a lawful search of a gun shop, seized a sawed-off shotgun lying in plain view. Id. at 1175. In concluding that probable cause existed for the police to believe that the shotgun was "incriminating evidence of a crime," the Court reasoned that "[a] sawed-off shotgun, properly registered to its owner, is not contraband, but its lawful possession is, in ordinary experience, rare indeed. There is very little legitimate use for such a weapon."[2]Id. at 1177; see also United States v. Poulos, 895 F.2d 1113 (6th Cir.1990) (plain view seizure of gun silencer component parts which may be lawfully possessed if properly registered supported by probable cause because silencer parts are "intrinsically suspicious").
Similarly, in this case, opportunities for the lawful use of a one and one-half to two inch straw are "rare indeed." Truitt, 521 F.2d at 1177. Since no showing is required *923 that the officer's belief was "more likely true than false," Brown, 460 U.S. at 742, 103 S.Ct. at 1543, we hold that the officer's common-sense along with his law enforcement experience made it immediately apparent to him that the straw might be evidence of a crime.
In sum, we conclude that the officer met both requirements of the plain view doctrine and was justified in seizing the straw.

III. THE SEARCH OF THE TRUNK
The defendant's contention that a lawful search incident to arrest does not include the trunk of a vehicle is inapplicable to this case. Here, the defendant was not under arrest; rather, he was detained because of the officer's belief that cocaine was in the car. A police officer with probable cause to believe that contraband is concealed in a legitimately detained vehicle may search the trunk of the vehicle. United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982). We conclude that the finding of white powder residue on a cut-off straw by an officer experienced in investigating crimes involving narcotics is sufficient to constitute probable cause to believe that cocaine was concealed in the car.
For the reasons stated, the decision of the trial court is affirmed.
Affirmed.
BENTON, Judge, dissenting.
The evidence in this record proves that law enforcement officers detain and question citizens in motor vehicles by taking advantage of the fact that the vehicles must stop to pay the highway tolls. The majority adopts the Commonwealth's suggestion that law enforcement officers do not effect a stop when they approach and interrogate drivers of motor vehicles at will. The majority reaches this conclusion by adopting the fiction that the initial stop is caused by the traffic control design of the permanent highway toll booth and not by the law enforcement officials. Because a seizure occurs through the officers' deliberate display of authority and initiation of investigative interrogation, I dissent.
"The `grave danger' of abuse of discretion," Delaware v. Prouse, 440 U.S. 648, 662, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979), is not lessened because law enforcement officers take advantage of the stop caused by the highway toll booth, rather than the siren on a law enforcement vehicle, to speculatively select drivers for interrogation concerning their origins. In either case, there is unconstitutional, "unfettered governmental intrusion" based on the unconstrained exercise of a law enforcement officer's hunch. Id. at 663, 99 S.Ct. at 1401.
The Fourth Amendment was designed not merely to protect against official intrusions whose social utility was less as measured by some "balancing test" than its intrusion on individual privacy; it was designed in addition to grant the individual a zone of privacy whose protections could be breached only where the "reasonable" requirements of the probable-cause standard were met. Moved by whatever momentary evil has aroused their fears, officialsperhaps even supported by a majority of citizensmay be tempted to conduct searches that sacrifice the liberty of each citizen to assuage the perceived evil. But the Fourth Amendment rests on the principle that a true balance between the individual and society depends on the recognition of "the right to be let alonethe most comprehensive of rights and the right most valued by civilized men."
New Jersey v. T.L.O., 469 U.S. 325, 361-62, 105 S.Ct. 733, 753, 83 L.Ed.2d 720 (1985) (Brennan, J., concurring in part and dissenting in part) (footnote and citation omitted).
An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile *924 travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrial or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile [and stopped for a red light, toll booth, or stop sign], the security guaranteed by the Fourth Amendment would be seriously circumscribed. As Terry ... recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.
Prouse, 440 U.S. at 662-63, 99 S.Ct. at 1400-01 (footnote and citation omitted). Today's decision seriously compromises the reasonable expectations of privacy that a driver venturing onto the highways has been guaranteed by constitutional law.
"[A] person is `seized' ... when, by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (emphasis added). "Moreover, stopping or diverting an automobile in transit, with the attendant opportunity for a visual inspection of areas of the passenger compartment not otherwise observable, is materially more intrusive than a question put to a passing pedestrian." Id. at 556-57, 100 S.Ct. at 1878. A seizure occurs whenever the government effects "a meaningful interference, however brief, with an individual's freedom of movement." United States v. Jacobsen, 466 U.S. 109, 113 n. 5, 104 S.Ct. 1652, 1656 n. 5, 80 L.Ed.2d 85 (1984). It is a fundamental principle that "[s]topping an automobile and detaining the occupants at a roadblock constitutes a seizure under the fourth amendment of the United States Constitution." Simmons v. Commonwealth, 238 Va. 200, 202, 380 S.E.2d 656, 658 (1989) (citing Delaware v. Prouse, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395-96, 59 L.Ed.2d 660 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976)). The fourth amendment is implicated, and a seizure occurs "even though the purpose of the stop is limited and the resulting detention quite brief." Prouse, 440 U.S. at 653, 99 S.Ct. at 1396.
Virginia law also provides that "[t]he owner or operator of any motor vehicle ... shall stop on the signal of any law-enforcement officer who is in uniform ... and shall, on the officer's request, exhibit his... driver's license ... and write his name in the presence of the officer ... for the purpose of establishing his identity." Code § 46.2-104. Although an officer's authority to stop a motor vehicle is limited by the fourth amendment and by Virginia statutes, see Code §§ 19.2-59, and 46.2-103; as a matter of statutory law, it is unlawful for an operator to fail to stop upon a law enforcement officer's proper display of authority. Code §§ 46.2-104 and 46.2-817. Thus, it cannot be said that an automobile operator stopped by a law enforcement officer in Virginia is free to leave. It necessarily follows that "[w]hen the police stop a motor vehicle and detain the occupant, this constitutes a `seizure' of the person for Fourth Amendment purposes, even though the function of the stop is limited and the detention brief." Zimmerman v. Commonwealth, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988).
The majority concludes that because the vehicle had stopped at the toll booth, State Trooper Childers did not effect a seizure. They reach that conclusion despite the uncontradicted evidence from Childers that he and several other persons assigned to the Special Investigations Division were knowingly using the toll booths on Interstate 95 for the purpose of randomly selecting, approaching, *925 and interrogating drivers of motor vehicles as they stopped to pay tolls. In effect, they established a de facto roadblock to detain drivers and to conduct the same type of "spot checks" condemned by Prouse.
Childers and other officers were assigned to the toll booth to look for vehicles travelling from Florida with drugs. Childers was standing on one of the toll booth structures wearing a cap or a jacket, both of which have the words "State Police" in prominent lettering. He was also wearing his badge. Childers described his duties as follows:
When I see a vehicle come into the toll booth my judgment is starting right then. I am assessing the vehiclewhat I see of itand if I see things that raise suspicion and my suspicions keep getting heightened or anywhere along there I decide it's not worth looking at you can back away. As far as starting a conversation if you stayed out there an hour on an average day might have a conversationI am guessingwith ten or fifteen vehicles.
Although the vehicle in question had Maryland license plates, Childers had a hunch that they were coming from Florida. He testified:
A Usually people coming from Floridanot necessarily from Florida, but beach areas someone coming from Floridalooks like they have been traveling on the road; they have been on the road some time, have luggage in the vehicle; their dresspeople obviouslyIt was warm that day in Virginia; however, it wasn't probably as warm as it was in Florida and they are dressed a little warmer and it tends to show they are coming from warmer climate.
Q Safe to say a person coming from Nags Head or from Wilmington; or Myrtle Beach; Pensacola; or Biloxi, Mississippi would look different?
A Entirely possible they all could look the same.
Q Nothing to identify these people, at first glance, that they came from Florida?
A Nothing at all.
Q They were coming from the south?
A Yes, sir.
Q It's equally as possibleisn't it? that they could have been coming from Petersburg?
A Yes, sir.
Q From Pine Hurst, North Carolina, where they might have been playing golf?
A Yes, sir. Entirely possible.
Q At the time you first saw them and made the assessment, "That you thought they were coming from Florida" had they done anything wrong?
A No, sir.
Q Any suspicion they had done anything or were doing anything wrong?
A No, sir.
Q You came up to the vehicle then?
A Yes, sir.
"[T]he Fourth Amendment addresses `misuse of power,' not the accidental effects of otherwise lawful government conduct." Brower v. County of Inyo, 489 U.S. 593, 596, 109 S.Ct. 1378, 1380, 103 L.Ed.2d 628 (1989) (quoting Byars v. United States, 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927)). Violation of the fourth amendment may be established by showing an intentional acquisition of physical control, in the absence of any reasonably articulable suspicion of criminal activity and accompanied with the driver's reasonable belief that he is not free to leave. Id. 489 U.S. at 596-97, 109 S.Ct. at 1380-81. Here, the fact that the vehicle was stopped at the toll booth was not merely incidental to or the accidental effect of Childers' conduct. That vehicles are required to stop at the toll booths in order to pay and in observance of the traffic control signs was intrinsic to the scheme of allowing the law enforcement officers, who were on foot, to *926 intercept moving vehicles. "It is clear, in other words, that a Fourth Amendment seizure ... occur[s] ... when there is a governmental termination of freedom of movement through means intentionally applied." Brower, 489 U.S. at 596-97, 109 S.Ct. at 1381.
Further, it is irrelevant that the automobile physically stopped at a statutorily mandated point, thus allowing the uniformed officer to step toward the oncoming automobile, to approach the driver before he drove off, and to "casually" ask the occupants their points of origin and destination. The test whether "a person has been `seized' within the meaning of the Fourth Amendment [remains] if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554, 100 S.Ct. at 1877.
Few, if any, of the thousands of people entering a toll booth on a major interstate thoroughfare would feel free to ignore the officer's advances and drive away. Thus, although a driver may be required to stop at a fixed traffic signal, a seizure occurs when a reasonable person would not feel free to leave after paying the fare because of the presence of a uniformed police officer approaching the vehicle. Based on this record, it is reasonable to conclude that a reasonable person would not have felt free to drive away from the toll booth if the gate had opened after the officer's initial display of authority. Moreover, under state law, Carson was obligated to remain where he was stopped. Code §§ 46.2-104 and 46.2-817. The approach to and interrogation of a driver in transit by a person identified as a law enforcement officer is accomplished by display of authority. It is constitutionally impermissible, unreasonably intrusive, and violative of any driver's expectation of privacy for an officer, acting without probable cause to believe a traffic infraction occurred or reasonable suspicion of criminal activity, to initiate an inquisitive conversation at a point where the traffic law mandates a driver to stop.
Here, the travelling public is faced with the specter of seeing law enforcement officers at toll booth barriers approaching and selecting vehicles for inquiry, reminiscent of checkpoints that formerly existed at the borders of Eastern European countries. The officer's approach to a vehicle on foot in the confines of the toll booth lane is a sufficient indicia of authority to cause a seizure. See Code §§ 46.2-104 and 46.2-817. There is a seizure by surprise and "by means of a possibly unsettling show of authority" as the police suddenly appear and begin interrogations. Prouse, 440 U.S. at 657, 99 S.Ct. at 1398.
When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulationsor other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered[no] legitimate basis [exists] upon which a [law enforcement officer] could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver.
Id. at 661, 99 S.Ct. at 1400.
The selective detentions and inquiries that result from the officer's speculative hunch involve the "kind of standardless and unconstrained discretion [which] is the evil the Court has discerned when in previous cases it has insisted that the discretion of the individual officer in the field be circumscribed at least to some extent." Id. "[I]llegimate and unconstitutional practices get their first footings ... by silent approaches and slight deviations from legal modes of procedure." Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886). It is precisely for these reasons that we held in Taylor v. Commonwealth, 6 Va.App. 384, 369 S.E.2d 423 (1988), that the police may not interfere with individuals travelling in motor vehicles unless there is some objective manifestation that the occupants are engaged in or have been engaged in criminal activity. Id. at 388-89, 369 S.E.2d at 425. That the law *927 enforcement officer's detention of the vehicle based on a hunch is deliberately designed to be facilitated by the de facto roadblock qualities of a toll booth does not make the practice any more constitutionally acceptable than the random stopping condemned by Prouse or the speculative, selective stopping condemned by Taylor.
The seizure of the straw also was unlawful. Childers testified that he started a conversation with the driver of the car and noticed a straw on the seat between the driver's legs. He grabbed the straw because it appeared to be "the type straw that people use to ingest cocaine." "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) (plurality opinion). However, the "mere fact that the items in question came lawfully within the officer's plain view" does not render a search or seizure reasonable. Arizona v. Hicks, 480 U.S. 321, 327, 107 S.Ct. 1149, 1154, 94 L.Ed.2d 347 (1987). In order to support a seizure, the officer must have probable cause. Id. The straw's size did not give Childers probable cause to believe the occupants possessed cocaine.
In Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), the Court upheld the seizure of a knotted balloon containing a substance. The Court found probable cause because "the distinctive character of the balloon itself spoke volumes as to its contents," id. at 743, 103 S.Ct. at 1544 (emphasis added), and because the officer had seen in the glove compartment "several small plastic vials, quantities of loose white powder, and an open bag of party balloons." Id. at 734, 103 S.Ct. at 1539. Nothing in Brown suggests that the size of a commonly used item such as a straw gives rise to probable cause that a person possesses cocaine. Indeed, in Harris v. Commonwealth, 241 Va. 146, 400 S.E.2d 191 (1991), our Supreme Court held that the police officer's hunch that a film canister, which the officer knew from his experience to be commonly used to store narcotics, did not give rise to probable cause that the particular film canister discovered during a frisk for weapons contained narcotics. The lesson to be gleaned from these cases is that intrusions on individual privacy are not justified by a hunch or suspicion that an item that has ordinary and common usages may be at that moment concealing some illegal substance. That an item may have multiple usages, one conceivably unlawful, does not establish probable cause to seize the item as contraband when it is found alone, in the absence of other incriminating circumstances.
Neither United States v. Poulos, 895 F.2d 1113 (6th Cir.1990), nor United States v. Truitt, 521 F.2d 1174 (6th Cir.1975), is precedent justifying the warrantless seizure of a shortened straw. In those cases, law enforcement officers seized gun silencer components and a sawed-off shotgun, neither of which is an intrinsically lawful or innocent object. A straw, even if shortened, is an intrinsically lawful or innocent object. Although the length of a straw may cause a law enforcement officer to be suspicious of its purpose or use, suspicion is not probable cause and does not justify a seizure of an object found in plain view. Hicks, 480 U.S. at 326, 107 S.Ct. at 1153. In focusing upon what it believes to be the rarity of the "opportunities of the lawful use of [the shortened] straw," the majority loses sight of the "probable cause" analysis of Brown. To elevate the officer's suspicion of the balloon's contents to probable cause to believe the balloon contained cocaine, the Court in Brown relied upon the vials, white powder, and open bag of balloons that the officer observed in the glove compartment contemporaneously with his observation of the knotted balloon on the seat of the automobile. 460 U.S. at 742-43, 103 S.Ct. at 1543-44. Absent corroborating or independent evidence that some crime has been committed or is being committed, an otherwise lawful object, which a police officer suspiciously believes may be used for illegal purposes, by itself does not *928 give rise to the conclusion that the object is evidence of a crime.
Childers may have had a suspicion that the straw was the type of device "that people used to ingest cocaine." However, his suspicion could not overcome the numerous possibilities for legitimate use, such as use by a former smoker to substitute for cigarettes. It was not until Childers seized the straw and examined it that he realized it contained a powder residue. Because Childers had no basis to seize the straw, the resulting discovery of cocaine residue and other contraband should have been suppressed as fruit of the poisonous tree. Wong Son v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). Furthermore, the subsequent detention and arrest were unlawful.
For these reasons, I would suppress the evidence and reverse the convictions.

UPON A PETITION FOR REHEARING EN BANC

BEFORE THE FULL COURT
On May 30, 1991 came the appellant, by counsel, and filed a petition praying that the Court set aside the judgment rendered herein on May 14, 1991 and grant a rehearing en banc thereof.
On consideration whereof, the petition for rehearing en banc is granted, the mandate entered herein on May 14, 1991 is stayed pending the decision of the Court en banc, and the appeal is reinstated on the docket of this Court.
The parties shall file briefs in compliance with Rule 5A:35. It is further ordered that the appellant shall file with the clerk of this Court ten additional copies of the appendix previously filed in this case.
NOTES
[1] The Court extended this position to include all plain view seizure cases in Arizona v. Hicks, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).
[2] The Court in Truitt further recognized that "the environment in which the sawed-off shotgun was found, a gun and tackle shop" made the possession of the sawed-off shotgun "less suspicious." Id.