## James Patrick Carson

### v.

## Commonwealth of Virginia

Record No. 911887

September 18, 1992

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy and Hassell, JJ.,
and Poff, Senior Justice

*Roger Allan Inger* for appellant.

*Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

In March 1989, defendant James Patrick Carson was sentenced to confinement in the penitentiary, and to a fine, upon conviction by the trial court, sitting without a jury, of possession of cocaine and marijuana, both with intent to distribute. Subsequently, a panel of the Court of Appeals, with one judge dissenting, affirmed the convictions. *Carson* v. *Commonwealth,* 12 Va. App. 497, 404 S.E.2d 919 (1991). Thereafter, the Court of Appeals granted a rehearing en banc and affirmed the convictions for the reasons stated in the panel opinion. Four judges, including the Chief Judge, dissented. *Carson* v. *Commonwealth,* 13 Va. App. 280, 410 S.E.2d 412 (1991).

We awarded the defendant this appeal to consider whether the Court of Appeals erred: in ruling that the approach of the motor vehicle in which the defendant was riding and the questioning by the police officer did not constitute an unreasonable seizure within the meaning of the Fourth Amendment to the United States Constitution; in ruling that the initial stop of the motor vehicle did not violate the defendant's Fourth Amendment rights; in ruling that seizure of the contraband fell within the ''plain view'' exception to the Fourth Amendment warrant requirement; and, in ruling that the search of the trunk of the defendant's automobile was lawful as a search based on probable cause, not a search incident to an arrest.

We have considered these questions and, for the reasons articulated in the Court of Appeals' opinion, we will affirm the judgment of the Court of Appeals.

*Affirmed.*

JUSTICE HASSELL, with whom JUSTICE WHITING and JUSTICE LACY join, dissenting.

I dissent because the majority's opinion permits law enforcement officers to detain, unreasonably, any law-abiding citizen traveling in a vehicle anywhere in the Commonwealth merely because that citizen has stopped his or her vehicle to comply with a traffic-control device. Such a practice is unconstitutional and ought not be condoned.

The facts clearly establish that State Trooper Childers and other law enforcement officers assigned to the Special Investigations Division established a *de facto* road block to detain drivers and to conduct spot checks. Trooper Childers and certain other officers were assigned to a position at a toll booth on Interstate 95. They were looking for automobiles traveling from Florida which might have been used to transport illegal drugs. Trooper Childers, wearing his state police badge and a cap or a jacket which identified him as a state police officer, was standing on a toll booth structure. He described his responsibilities as follows:

> When I see a vehicle come into the toll booth my judgment is starting right then. I am assessing the vehicle — what I see of it — and if I see things that raise suspicion and my suspicions keep getting heightened or anywhere along there I decide it's not worth looking at [,] you can back away. As far as starting a conversation if you stayed out there an hour on an average day might have a conversation — I am guessing — with ten or fifteen vehicles.

When Trooper Childers observed Carson's car, the trooper had a ''hunch'' that Carson's car had departed from Florida, even though Maryland license plates were affixed to the car. Carson testified:

> Answer: Usually people coming from Florida — not necessarily from Florida, but beach areas someone coming from Florida — looks like they have been traveling on the road; they have been on the road some time, have luggage in the vehicle; their dress —people obviously — It was warm that day in Virginia; however, it wasn't probably as warm as it was in Florida and they are dressed a little warmer and it tends to show they are coming from a warmer climate.

Question: Safe to say a person coming from Nags Head or from Wilmington; or Myrtle Beach; Pensacola; or Biloxi, Mississippi would look different?

Answer: Entirely possible they all could look the same.

Question: Nothing to identify these people, at first glance, that they came from Florida?

Answer: Nothing at all.

Question: They were coming from the south?

Answer: Yes, sir.

Question: It's equally as possible — isn't it — that they could have been coming from Petersburg?

Answer: Yes, sir.

Question: From Pine Hurst, North Carolina, where they might have been playing golf?

Answer: Yes, sir. Entirely possible.

Question: At the time you first saw them and made the assessment, ''That you thought they were coming from Florida'' had they done anything wrong?

Answer: No, sir.

Question: Any suspicion they had done anything or were doing anything wrong?

Answer: No, sir.

Question: You came up to the vehicle then?

Answer: Yes, sir.

In my opinion, Trooper Childers implemented a *de facto* road block when he randomly approached and detained cars at the toll booth where the cars were required to stop and pay a toll. When Trooper Childers approached Carson's car, a seizure occurred within the meaning of the Fourth Amendment. "[S]topping an automobile and detaining its occupants constitutes a 'seizure' . . . even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware* v. *Prouse*, 440 U.S. 648, 653 (1979); *Simmons* v. *Commonwealth*, 238 Va. 200, 202, 380 S.E.2d 656, 657 (1989).

Furthermore, Code §§ 46.2-104 and 46.2-817 required that Carson remain where he was stopped when he was approached and detained by Trooper Childers and, thus, Carson was not free to leave. Code § 46.2-104 states, in part:

The owner or operator of any motor vehicle, trailer, or semi-trailer shall stop on the signal of any law-enforcement officer who is in uniform or shows his badge or other sign of authority and shall, on the officer's request, exhibit his registration card, driver's license, learner's permit, or temporary driver's permit and write his name in the presence of the officer, if so required, for the purpose of establishing his identity.

Code § 46.2-817 states, in part:

Any person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful or wanton disregard of such signal so as to interfere with or endanger the operation of the law-enforcement vehicle or endanger other property or person, or who increases his speed and attempts to escape or elude such law-enforcement officer, shall be guilty of a Class I misdemeanor.

We recently stated:

To avoid constitutionally impermissible infringements on privacy, the roadblock must be carried out pursuant to a plan or practice which is explicit, contains neutral criteria, and limits the conduct of the officers undertaking the roadblock. Such a

plan serves to insure that one's 'reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field.'

*Simmons* v. *Commonwealth*, 238 Va. at 202-03, 380 S.E.2d at 658 (*quoting Brown* v. *Texas*, 443 U.S. 47, 51 (1979)).

Here, Trooper Childers' own testimony unequivocally establishes that the state police had no plan to insure that Carson's reasonable expectation of privacy was not subject to arbitrary invasion solely at the officer's unfettered discretion. Rather, Childers' testimony demonstrates that his decision to seize Carson's car was based solely upon his (Childers') suspicion which clearly violates the Fourth Amendment's prohibition against unreasonable searches and seizures.

As the dissent stated in the Court of Appeals:

> That vehicles are required to stop at the toll booths in order to pay and in observance of the traffic control signs was intrinsic to the scheme of allowing the law enforcement officers, who were on foot, to intercept moving vehicles. "It is clear, in other words, that a Fourth Amendment seizure . . . occur[s] . . . when there is a governmental termination of freedom of movement *through means intentionally applied.*" *Brower*, 489 U.S. at 596-97.
>
> Further, it is irrelevant that the automobile physically stopped at a statutorily mandated point, thus allowing the uniformed officer to step toward the oncoming automobile, to approach the driver before he drove off, and to "casually" ask the occupants their points of origin and destination. The test whether "a person has been 'seized' within the meaning of the Fourth Amendment [remains] if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554.
>
> Few, if any, of the thousands of people entering a toll booth on a major interstate thoroughfare would feel free to ignore the officer's advances and drive away. Thus, although a driver may be required to stop at a fixed traffic signal, a seizure occurs when a reasonable person would not feel free to leave after paying the fare because of the presence of a uniformed police

officer approaching the vehicle. Based on this record, it is reasonable to conclude that a reasonable person would not have felt free to drive away from the toll booth if the gate had opened after the officer's initial display of authority.

*Carson* v. *Commonwealth*, 12 Va. App. 497, 508, 404 S.E.2d 919, 925-26 (1991) (dissent), *aff'd reh'g en banc*, 13 Va. App. 280, 410 S.E.2d 412 (1991).

Finally, the majority permits the government to intrude upon privacy interests of citizens merely because a citizen happens to be in an automobile. I believe that we must be ever mindful of the admonition articulated by the Supreme Court in *Delaware* v. *Prouse*:

> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed . . . . [P]eople are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

440 U.S. at 662-63 (footnote omitted).

Therefore, I respectfully dissent.