UPON A REHEARING EN BANC
JEAN HARRISON CLEMENTS, Judge.
Joshua Bristol was convicted in a bench trial of driving under the influence of alcohol, in violation of Code § 18.2-266, and maiming another person while driving under the influence of alcohol, in violation of Code § 18.2-51.4. At trial, the Commonwealth introduced into evidence a certificate of blood analysis to establish a rebuttable presumption that Bristol was intoxicated at the time of the alleged offenses. See Code §§ 18.2-268.2 and 18.2-269. On appeal, Bristol contends the trial court erred in admitting the certificate of analysis into evidence because he was not validly arrested before the blood sample referenced in the certificate of analysis was withdrawn from him, as required under the implied consent law. On May 3, 2005, a unanimous panel of this Court agreed with Bristol and reversed his convictions. Bristol v. Commonwealth, 45 Va.App. 534, 543-44, 612 S.E.2d 244, 248 (2005). On May 31, 2005, we granted the Commonwealth’s petition for a rehearing en banc, stayed the mandate of the panel decision, and reinstated the appeal. Bristol v. Commonwealth, 45 Va.App. 673, 613 S.E.2d 480 (2005). Concluding, upon rehearing en banc, that Bristol was validly arrested prior to the removal of his blood, we affirm the judgment of the trial court and Bristol’s convictions.
I. BACKGROUND
“Under familiar principles of appellate review, we view the evidence and all reasonable inferences fairly deducible from that evidence in the light most favorable to the Commonwealth, the party that prevailed below.” Banks v. Commonwealth, 41 Va.App. 539, 543, 586 S.E.2d 876, 877 (2003). So viewed, the evidence presented to the trial court established *592 that, on the evening of July 4, 2003, Joshua Bristol drove his motorcycle to a bar in Portsmouth called the Three Cheers Lounge, where he and his friends drank alcohol, played pool, and socialized for about three hours. Bristol exited the bar around 1:45 a.m., as it was in the process of closing. As Bristol walked from the bar, Debra Fly asked if he would give her a ride on his motorcycle. Bristol agreed.
With Fly sitting behind him on the motorcycle, Bristol circled the bar twice, weaving around the parking lot at speeds estimated to be between 50 and 80 m.p.h. and nearly hitting two pedestrians. Completing his second circuit of the parking lot, Bristol drove directly toward a group of people standing near the curb outside the front of the bar. Without appearing to slow down, the motorcycle struck April Mapp and knocked her into the air. Bristol lost control of the motorcycle, causing him and Fly to fall off the vehicle.
Responding to a report of an accident with injuries, Portsmouth Police Officer J.M. Doyle arrived at the scene at approximately 1:56 a.m. He observed Bristol lying near his motorcycle in the parking lot at the front of the bar. He was conscious but appeared to have some “scrapes and bruises” on his face. Doyle also observed Mapp lying in the parking lot approximately fifty feet from Bristol’s location. She appeared to have “head injuries.” Before Doyle reached the injured, emergency medical personnel arrived and began treating them.
The paramedic who attended Bristol at the scene of the accident and in the ambulance on the way to the hospital observed that, although alert and in stable condition when placed in the ambulance, Bristol “seemed a little bit confused” and smelled of alcohol. She asked Bristol if he had been drinking, and Bristol responded that he had.
Interviewing witnesses outside the bar, Officer Doyle learned that, after exiting the bar shortly before it closed at 2:00 a.m., Bristol got on his motorcycle with a passenger behind him and drove “through the parking lot showing off.” *593 Doyle also learned that Bristol then drove “toward[ ] a crowd of people, at which time the accident occurred.”
After speaking with the people outside the bar, Officer Doyle went to the hospital to check on Bristol’s injuries and speak with him about the accident. Doyle arrived at Bristol’s bedside in the trauma unit of the hospital around 2:50 a.m. In speaking with Bristol, Doyle noticed that Bristol’s speech was “slightly slurred.” Doyle also observed that Bristol had an odor of alcohol about his person that was “quite strong.” At 2:56 a.m., Doyle told Bristol he was under arrest for suspicion of driving under the influence of alcohol. Reading from a prepared card, Doyle then advised Bristol of Virginia’s implied consent law, in pertinent part, as follows:
Any person who operates a motor vehicle upon a highway ... in this Commonwealth is deemed thereby as a condition of such operation to have consented to have samples of his blood and breath taken for chemical test to determine the alcohol and drag content of his blood if arrested within three hours of the alleged offense or violation of 18.2-266----He shall submit to a breath test unless the test is unavailable or you are physically unable to comply, in which case a blood test will be given.
See Code § 18.2-268.2. Doyle also informed Bristol that a “[cjonviction of unreasonably refusing to [submit to a] chemical test constitutes grounds for suspension of the privilege to operate a motor vehicle in this Commonwealth for a period of one year.” See Code § 18.2-268.3. Bristol indicated he understood the implied consent law and agreed to have his blood drawn. Doyle testified he did not take Bristol into physical custody upon placing him under arrest because Bristol was still “being seen” by the hospital’s medical personnel.
At 3:05 a.m., Bristol signed a consent form provided by the hospital, giving his permission to have his blood withdrawn. He then accompanied Officer Doyle to the hospital’s emergency room. The medical technologist who was to withdraw Bristol’s blood took the consent form and asked Bristol if he understood that the blood was being drawn for the police *594 officer. Bristol said that he understood and that he consented. The medical technologist drew the first vial of blood from Bristol’s arm at 3:49 a.m. and completed the process at 3:53 a.m., at which time she sealed the two vials in boxes and gave them to Doyle.
Officer Doyle then gave the vials of blood to Officer James Eberts, the chief investigating officer in the case, who had arrived at the hospital as Doyle was arranging for the withdrawal of Bristol’s blood. Eberts attempted to speak with Bristol in the emergency room but found him “incoherent” and not wanting to talk. According to Eberts, Bristol’s “speech was slurred and slow” and he appeared to be in pain from the accident. Eberts testified Bristol was not “physically” placed under arrest that night “because he was in the hospital for treatment.” Upon returning to the police station, Eberts completed his accident report, filled out the paperwork for the drawn blood, and turned the vials over to the property and evidence department, which mailed them to the Division of Forensic Science in Richmond.
On July 7, 2003, Officer Eberts returned a phone call from Bristol’s wife, who wanted to speak with the officer about the accident. After Bristol’s wife arranged to meet with Eberts at the police station, Bristol, who had been discharged from the hospital, “also got on the line and agreed” to meet with Eberts at the police station. The next day, Bristol and his wife went to the police station and spoke with Eberts. When the meeting ended, Bristol was not physically taken into custody and was “free to go.”
On August 18, 2003, the Division of Forensic Science filed a certificate of analysis indicating that laboratory analysis of the blood withdrawn from Bristol at 3:49 a.m. on July 5, 2003, revealed that Bristol had a blood alcohol content at the time of .11% by weight by volume. On September 4, 2003, the grand jury indicted Bristol for driving under the influence of alcohol, in violation of Code § 18.2-266, and maiming another while driving under the influence of alcohol, in violation of Code § 18.2-51.4. On September 11, 2003, Bristol turned himself in *595 at the police station, at which time he was physically taken into custody by the police.
At trial, Bristol objected to the introduction of the certificate of analysis, arguing, inter alia, that the certificate was inadmissible under the implied consent law because he had not been validly arrested at the time the blood sample was taken. There was no arrest at the hospital, he argued, because the police lacked probable cause and never restrained him or took him into physical custody. The trial court overruled the objection and admitted the certificate of analysis into evidence. An expert forensic toxicologist then testified that no person with a blood alcohol content of .11% by weight by volume could “safely operate a motor vehicle.”
The trial court subsequently convicted Bristol of the charged offenses, and this appeal followed.
II. ANALYSIS
Bristol contends on appeal, as he did below, that he was not validly arrested before his blood was withdrawn for chemical testing, as required by the implied consent law. Bristol argues his purported arrest in the hospital by Officer Doyle was not valid, for purposes of the implied consent law, because Doyle lacked probable cause to arrest him and “did nothing to secure [that] arrest.” He was not validly arrested within the meaning of the implied consent law, he asserts, until he turned himself in at the police station and the police took him into physical custody on the indictment, more than two months after the tested sample of his blood was taken. Thus, he concludes, the trial court erred in determining he was validly arrested prior to the removal of his blood and in consequently ruling the certificate of analysis was admissible under the implied consent statute. We disagree.
Code § 18.2-268.2, Virginia’s implied consent law, provides, in pertinent part, as follows:
A. Any person ... who operates a motor vehicle upon a highway ... in this Commonwealth shall be deemed thereby, as a condition of such operation, to have consented to *596 have samples of his blood, breath, or both ... taken for a chemical test to determine the alcohol ... content of his blood, if he is arrested for violation of [Code] § 18.2-266 ... within three hours of the alleged offense.
B. Any person so arrested ... shall submit to a breath test. If the breath test is unavailable or the person is physically unable to submit to the breath test, a blood test shall be given.
“The purpose of the implied consent law requiring the test to be taken is to determine the concentration of alcohol in a driver’s blood or breath sample, and thereby determine the driver’s state of intoxication or sobriety.” Quinn v. Commonwealth, 9 Va.App. 321, 324, 388 S.E.2d 268, 270 (1990). If the blood or breath test “reveals a blood alcohol concentration of .08% or more, the Commonwealth is entitled to a rebuttable presumption that the person was intoxicated.” Smith v. Commonwealth, 32 Va.App. 228, 233, 527 S.E.2d 456, 459 (2000) (citing Code § 18.2-269).
However, “[t]he results of a blood or breath test provided by [the implied consent law] are admissible against the accused in a trial for driving under the influence of alcohol [only] so long as the accused has first been validly arrested.” Durant v. Suffolk, 4 Va.App. 445, 448, 358 S.E.2d 732, 734 (1987). Absent a valid, timely arrest, “the Commonwealth has no right to collect the [blood or breath] sample in the first place and, a fortiori, even less right to offer into evidence test results based on the sample.” Cutright v. Commonwealth, 43 Va.App. 593, 601, 601 S.E.2d 1, 5 (2004). Indeed, if an accused is not validly arrested prior to the taking of his blood, his “consent for blood alcohol testing is not implied,” Smith, 32 Va.App. at 233, 527 S.E.2d at 459, and his actual consent “ ‘based upon a belief, generated by the officer’s recitation of the [implied consent] law, that he was bound to submit to a test’ ” is invalid, Durant, 4 Va.App. at 449, 358 S.E.2d at 734 (quoting Thomas v. Town of Marion, 226 Va. 251, 254, 308 S.E.2d 120, 122 (1983)). Thus, an untimely arrest “results in exclusion of the certificate of analysis of the blood.” Overbee *597 v. Commonwealth, 227 Va. 238, 242, 315 S.E.2d 242, 243 (1984).
It is clear, therefore, that the certificate of analysis was not admissible in the present case unless Officer Doyle validly arrested Bristol in the hospital before the medical technologist drew Bristol’s blood at 3:49 a.m. Although the term “arrested” is not defined by Code § 18.2-268.2, it is well established that, to be valid, a warrantless arrest “[(1)] requires a demonstration of probable cause regarding criminal conduct and [(2)] occurs when the officer actually restrains the individual or the individual submits to the authority of the officer.” White v. Commonwealth, 267 Va. 96, 104, 591 S.E.2d 662, 666 (2004). Upon our review of the record in this case, we conclude that Officer Doyle’s arrest of Bristol at the hospital satisfied both of the conditions set forth in White and was therefore valid.
A. Probable Cause
“[A]n assertion that the police lacked probable cause to arrest a defendant presents a question of both law and fact, which is reviewed de novo on appeal.” McCain v. Commonwealth, 261 Va. 483, 489, 545 S.E.2d 541, 545 (2001); see Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996). However, “we are bound by the trial court’s findings of historical fact unless ‘plainly wrong’ or without evidence to support them and we give due weight to the [reasonable] inferences drawn from those facts by resident judges and local law enforcement officers.” McGee v. Commonwealth, 25 Va.App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citing Ornelas, 517 U.S. at 699, 116 S.Ct. at 1663).
The legal standard of probable cause, as the term suggests, relates to probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons. The presence or absence of probable cause is not to be examined from the perspective of a legal technician. Rather, probable cause exists when the facts and circumstances within the officer’s *598 knowledge, and of which he has reasonably trustworthy information, alone are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed.
Taylor v. Commonwealth, 222 Va. 816, 820, 284 S.E.2d 833, 836 (1981). “In determining whether probable cause exists[,] courts will test what the totality of the circumstances meant to police officers trained in analyzing the observed conduct for purposes of crime control.” Hollis v. Commonwealth, 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976). “ ‘Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.’” Boyd v. Commonwealth, 12 Va.App. 179, 188-89, 402 S.E.2d 914, 920 (1991) (quoting Illinois v. Gates, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983)). Moreover, an officer investigating whether an offense has been or is being committed “is permitted to make ‘common-sense conclusions about human behavior’ in assessing a situation.” Carson v. Commonwealth, 12 Va.App. 497, 502, 404 S.E.2d 919, 922 (quoting Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (plurality opinion)), affd en banc, 13 Va.App. 280, 410 S.E.2d 412 (1991), affd, 244 Va. 293, 421 S.E.2d 415 (1992).
Code § 18.2-266(ii) prohibits a person from operating a motor vehicle “while such person is under the influence of alcohol.” The statute’s purpose “is to prohibit drinking and driving where the driver’s ability is impaired to operate safely a motor vehicle.” Thurston v. City of Lynchburg, 15 Va.App. 475, 483, 424 S.E.2d 701, 705 (1992). “That degree of intoxication, or being ‘under the influence of alcohol,’ is established when any person has consumed enough alcoholic beverages to ‘so affect his manner, disposition, speech, muscular movement, general appearance or behavior, as to be apparent to observation.’ ” Id. (quoting Gardner v. Commonwealth, 195 Va. 945, 954, 81 S.E.2d 614, 619 (1954)). The relevant inquiry here, therefore, is whether, when examined in their totality, the circumstances known to Officer Doyle at the time he arrested Bristol were sufficient to permit a reasonable person to be *599 lieve that Bristol had drunk enough alcohol to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior when he was operating his motorcycle in the parking lot of the bar.
The evidence in this case established that, when Officer Doyle told Bristol at the hospital that he was under arrest, the officer knew Bristol had been in the bar until nearly closing time and that, upon exiting the bar, Bristol had driven his motorcycle, with a passenger aboard, through the bar parking lot showing off. Doyle also knew that Bristol had then driven straight toward a crowd of people standing near the curb at the front of the bar. The officer further knew that, upon reaching the crowd, Bristol had crashed, causing injury to himself and Mapp. Having seen Mapp’s post-accident condition and her position in the parking lot relative to Bristol’s location, the officer could reasonably infer that Mapp’s injuries were the result of a relatively high-speed crash. Additionally, Doyle knew from his own observations at the hospital that Bristol had a “quite strong” odor of alcohol about his person and that, although his only apparent injuries were scrapes and bruises, Bristol’s speech was slurred.
We conclude that a reasonable person could properly infer from the totality of these circumstances that Bristol had drunk enough alcohol, at the time of the accident, to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior. See, e.g., Fierst v. Commonwealth, 210 Va. 757, 760, 173 S.E.2d 807, 810 (1970) (holding that a suspect’s slumped posture in the car, wan or drunken appearance, “mumbly” speech, inability to locate his license, and need for assistance in exiting the car were sufficient indicators of intoxication to warrant his arrest); Clarke v. Commonwealth, 32 Va.App. 286, 296, 527 S.E.2d 484, 489 (2000) (holding that a suspect’s bloodshot eyes and erratic speech pattern and the odor of alcohol about the suspect’s person provided probable cause to arrest him for public intoxication). We hold, therefore, that Officer Doyle had probable cause to arrest Bristol for driving under the influence of alcohol, in violation of Code § 18.2-266.
*600 B. Effectuation of the Arrest
We next turn to Bristol’s claim that his purported arrest in the hospital by Officer Doyle was invalid, for purposes of the implied consent law, because Doyle did not “secure” the arrest. Bristol asserts that, notwithstanding the officer’s testimony that he told him he was under arrest, Doyle never restrained him or took him into physical custody. Thus, Bristol reasons, Doyle’s actions were insufficient to actually effectuate the arrest. Consequently, he concludes, “[a]t no point prior to the extraction of [his] blood was he ever arrested by Officer Doyle.” We disagree.
The legal determination whether an arrest occurred requires a de novo review on appeal of the application of the relevant law to the historical facts as found by the trial court. See Cavell v. Commonwealth, 28 Va.App. 484, 486-87, 506 S.E.2d 552, 553 (1998) (en banc) (conducting a de novo review of the issue whether an officer actually effectuated the appellant’s arrest); see also United States v. Hamlin, 319 F.3d 666, 671 (4th Cir.2003) (holding that an appellate court reviews de novo the legal determination whether an officer’s actions “amount to an arrest”).
“ With a few statutory exceptions, ... the common law relating to arrest is the law on that subject in Virginia.’ ” Cavell, 28 Va.App. at 486, 506 S.E.2d at 553 (quoting Galliher v. Commonwealth, 161 Va. 1014, 1021, 170 S.E. 734, 736 (1933)). “Under the common law, an arrest required either the application of physical force or, where that was absent, submission to the assertion of authority.” Id. (citing California v. Hodari D., 499 U.S. 621, 626-27, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991)); see also Howard v. Commonwealth, 210 Va. 674, 677, 173 S.E.2d 829, 832 (1970) (“Ordinarily, an arrest is made by the actual restraint of the person of the defendant or by his submission to the custody of an officer.”). Thus, an officer’s “immediate physical ability to arrest, without more, was not sufficient to effectuate an arrest.” Cavell, 28 Va.App. at 486, 506 S.E.2d at 553. Likewise, an officer’s assertion of authority, by itself, was not enough to *601 constitute an arrest. See Hodari D., 499 U.S. at 626-27, 111 S.Ct. at 1551.
Indeed, as the United States Supreme Court explained in Hodari D.:
“Mere words will not constitute an arrest, while, on the other hand, no actual, physical touching is essential. The apparent inconsistency in the two parts of this statement is explained by the fact that an assertion of authority and purpose to arrest followed by submission of the arrestee constitutes an arrest. There can be no arrest without either touching or submission.”
Id. (quoting Rollin M. Perkins, The Law of Arrest, 25 Iowa L.Rev. 201, 206 (1940) (footnotes omitted)). In sum, an arrest occurs, as previously noted, only when the arresting officer “actually restrains the individual or the individual submits to the authority of the officer.” White, 267 Va. at 104, 591 S.E.2d at 666.
In the present case, it is undisputed that Officer Doyle did not restrain or take physical custody of Bristol in the hospital. The relevant inquiry, therefore, is twofold: whether Doyle asserted his authority with the purpose to arrest Bristol and, if so, whether Bristol submitted to that authority. If not, no arrest occurred. “[T]he test for existence of a ‘show of authority’ is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer’s words and actions would have conveyed that to a reasonable person.” Hodari D., 499 U.S. at 628, 111 S.Ct. at 1551. Upon reviewing the relevant record evidence in light of the foregoing principles of law, we conclude that Doyle asserted his authority with the purpose to arrest Bristol and that Bristol submitted to that authority.
The evidence established that, after seeking out Bristol at the hospital and interviewing him regarding his involvement in the motorcycle accident at the bar, Officer Doyle told Bristol he was under arrest for driving under the influence of alcohol. Doyle then recited pertinent portions of Virginia’s implied consent law, effectively informing Bristol that, by virtue of the *602 arrest, he must have a sample of his blood taken to determine its alcohol content or face prosecution and the possibility of having his privilege to drive in Virginia suspended for a year if he unreasonably refused to give such a sample. In response, Bristol acknowledged he understood the implied consent law and agreed to have his blood drawn pursuant to that law. In succession, Bristol then executed a consent form authorizing the drawing of his blood, informed the medical technologist that he agreed to have his blood drawn for the officer, and gave two vials’ worth of blood, all while accompanied by Doyle.
Plainly, in telling Bristol he was under arrest and advising him of Virginia’s implied consent law, Officer Doyle asserted his lawful authority to arrest Bristol for driving under the influence of alcohol and to initiate, in conjunction with that arrest, the statutorily mandated investigation of Bristol’s blood alcohol content. See Code §§ 19.2-81, 18.2-266(ii), and 18.2-268.2(B). The officer’s recitation of the implied consent law informed Bristol that the arrest was for the purpose of invoking the procedures of that law in order to obtain either a blood sample from Bristol for chemical testing or Bristol’s prosecution and conviction for unreasonably refusing to submit to such testing. This show of authority clearly indicated that Bristol was not free to leave the officer’s presence, even if he were released from the care of the hospital’s medical staff. Although there was no physical contact or other form of physical restraint imposed by the officer, a reasonable person in this situation would have perceived from Doyle’s words and actions that submission to the officer’s authority was compelled. Indeed, Bristol yielded to that authority by agreeing to submit to a blood test, accompanying the officer to the emergency room, and providing a blood sample. We conclude, therefore, that Bristol’s consenting to the blood test constituted an acknowledgement of and a submission to Doyle’s assertion of authority. Accordingly, we hold that, for purposes of the implied consent law, an arrest occurred at that time.
*603 Bristol further asserts the arrest was never actually effectuated because the post-arrest actions of Officers Doyle and Eberts did not “objectively manifest an arrest.” Bristol notes in particular that, after being treated for his injuries, he was able to leave the hospital “without any official restraint” and he was not taken into physical custody when he voluntarily went to the police station to speak with Eberts three days after the accident. Likewise, Bristol continues, Doyle never brought him before a magistrate, informed Eberts of the arrest, or mentioned the arrest in his report.
Contrary to Bristol’s assertion, however, an arrest takes place once the arrestee “submits to the authority of the [arresting] officer.” White, 267 Va. at 104, 591 S.E.2d at 666. Thus, Bristol’s arrest was effectuated the moment he submitted to Officer Doyle’s authority by consenting to the blood test, notwithstanding the officers’ failure to subsequently act in a manner that “objectively manifest[ed] an arrest.” See generally Walter v. Commonwealth, 8 Va.App. 485, 490, 382 S.E.2d 484, 487 (1989) (holding that the defendant was under arrest within the meaning of the implied consent statute when the arresting officer placed him under arrest at the hospital, not when post-arrest procedural requirements were fulfilled following his release from the hospital). What occurred after the withdrawal of Bristol’s blood incident to that arrest has no bearing on the issue whether Doyle arrested Bristol before Bristol’s blood was withdrawn. Hence, such evidence is irrelevant to our analysis.
III. CONCLUSION
We hold, therefore, that Bristol was validly arrested within the meaning of Code § 18.2-268.2 prior to the taking of the blood sample referenced in the certificate of analysis. Consequently, the trial court did not err in admitting the certificate of analysis into evidence, and we affirm Bristol’s convictions.

Affirmed.